**Maurice Anton KIENLEN, Petitioner-Appellant,**

v.

**UNITED STATES of America, Respondent-Appellee.**

**No. 270-70.**

United States Court of Appeals, Tenth Circuit.

Jan. 12, 1971.

---

Robert I. Guenthner, Wichita, Kan. (Morris, Laing, Evans & Brock, Wichita, Kan., on the brief), for petitioner-appellant.

Richard L. Meyer, Asst. U. S. Atty. (Robert J. Roth, U. S. Atty., on the brief), for respondent-appellee.

Before PHILLIPS, PICKETT and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

By an indictment returned on January 26, 1966, Kienlen and his codefendant were charged with robbery of a federally insured bank by the use of dangerous weapons, in violation of 18 U.S.C. § 2113(a) (d).

On December 16, 1965, Kienlen appeared in open court in person and with his court-appointed attorney. During the course of the proceeding the court committed Kienlen to the Federal Medical Center at Springfield, Missouri, for an examination to determine whether he was mentally competent to "comprehend" his "position" and to assist adequately his counsel at his trial.

A further hearing was had on March 18, 1966. Kienlen appeared in person and with counsel appointed by the court. The court stated that the examination of Kienlen at the Federal Medical Center had been completed and a report made to the court to the effect that Kienlen was mentally capable of comprehending his "position" and assisting his counsel at his trial.

Counsel for Kienlen then filed a motion for the appointment of a psychiatrist to examine Kienlen. The court granted the motion and appointed Dr. Vernon J. Jobson, who examined Kienlen and reported that in his opinion, in December 1965, Kienlen was not suffering from any mental disease.

At a proceeding on May 5, 1966, Kienlen appeared in person and with his attorney. The attorney stated to the court that Kienlen desired to withdraw his former plea and enter a plea of guilty. Counsel for Kienlen further advised the court that he had gone over the matter several times with Kienlen, and that Kienlen had examined the report by Dr. Jobson, the psychiatrist appointed by the court at Kienlen's request, and that he and Kienlen had discussed Dr. Jobson's findings several times.

Kienlen then entered a plea of guilty. Before accepting it, the court fully explained to Kienlen his constitutional

rights in the matter and questioned him extensively to ascertain if his plea was entered intelligently and voluntarily and was not induced by promises of leniency or a lighter sentence.

The court also questioned Kienlen with respect to the report of the psychiatrist from the Federal Medical Center and the report from Dr. Jobson, and asked Kienlen if he had examined those reports and agreed with them. Kienlen answered that he had.

The court then advised Kienlen as to the maximum penalty that could be imposed.

After the court had become fully satisfied that the plea was not induced by any promises and was understandingly and voluntarily entered, he accepted the plea.

Thereafter, Kienlen was sentenced to imprisonment for 12 years, to be eligible for parole at any time the parole board might determine parole should be granted. 18 U.S.C.A. § 4208(a) (2).

On a prior appeal by Kienlen, this court affirmed. See Kienlen v. United States, 10 Cir., 379 F.2d 20. However, because Kienlen had asserted that his court-appointed counsel advised him that the M'Naughten Rule, rather than the Wion Rule, was the test of mental capacity in the Tenth Circuit, the court left the door open for Kienlen to initiate proceedings in the trial court at which he might submit evidence, including his testimony, on the question of whether he relied on erroneous advice given him.

Kienlen instituted such a proceeding and on October 8, 1967, was permitted to withdraw his plea of guilty.

The case was set for trial. The first trial ended in a mistrial, because the jury was unable to agree on a verdict. At a second trial, held in April 1968, the jury returned a verdict of guilty.

On April 19, 1968, after the court had received and considered a presentence report, the court sentenced Kienlen to imprisonment for a maximum period of 18 years, but provided that he should be given credit for the time which he had served under the original sentence.

On appeal by Kienlen from such conviction and sentence, this court affirmed. See United States v. Kienlen, 10 Cir., 415 F.2d 557.

On November 3, 1969, Kienlen filed a motion under 28 U.S.C.A. § 2255 to vacate such sentence.

The several grounds of the motion will be stated in the discussion thereof that follows.

From an order denying the motion, Kienlen has appealed.

At the trial, the sole defense interposed by Kienlen was mental incapacity at the time the robbery was committed.

At the trial, three doctors testified as witnesses for the United States. Their qualifications by education and experience were well established.

Dr. Virgil Harris, who is a clinical psychologist, testified that at the request of the United States Attorney he examined Kienlen on January 18, 1968; that he made several recognized psychological tests of Kienlen and also talked with him; that as a result of his examination and tests, it was his opinion that Kienlen, on December 9, 1965, was capable of knowing what he was doing, of knowing whether it was wrong, and of controlling his conduct.

Dr. Vernon J. Jobson was called as a witness for the United States. The evidence established that he was qualified as a psychiatrist. He testified that at the request of the United States Attorney he examined Kienlen on April 8, 1966, and again on January 18, 1968; that he sent Kienlen to Dr. J. Cooper, a neurologist, for examination and to ascertain whether he was suffering from any neurological disease. Such examination was made by Dr. Cooper, and the result reported to Dr. Jobson. Dr. Jobson further testified that he sent Kienlen to Dr. Virgil Harris for an examination to determine if his psychological functioning was normal. Such examination was made, and Dr. Harris reported the results thereof to Dr. Jobson. It

was stipulated that both reports were negative.

Dr. Jobson further testified that he sent Kienlen to Dr. M. Jacobs for an electroencephalogram, which measures the brain waves and shows whether any brain disease, such as a brain tumor, is present. Dr. Jacobs reported that the e.e.g. showed no abnormality.

Dr. Jobson also sent Kienlen to Dr. H. Loyd for examination to see if he was suffering from any disease that would cause him to be mentally disturbed. Dr. Loyd reported to Dr. Jobson the result of his examination and the report was negative.

Dr. Jobson further testified that as a result of his examination of Kienlen, before he referred him to the other doctors, he reached the conclusion that Kienlen, on December 9, 1965, knew the difference between right and wrong and was capable of controlling his conduct, and that the reports from the other doctors to whom he sent Kienlen confirmed the opinion he had reached.

Dr. Edward E. Long, who was Kienlen's physician when Kienlen was apprehended about 12 p. m., December 9, 1965, went with him to the city jail and remained with him until 4 a. m., December 10, 1965. He testified that in his opinion Kienlen had not been and was not then suffering from any mental disorder.

Kienlen was a patient at the Osawatomie State Hospital,[1] an institution for the treatment of mental disorders and diseases, from April 16 to June 4, 1958; July 15 to October 13, 1958; December 3, 1958, to January 30, 1959, and September 7 to 13, 1965.

Hiram Gonzales, as a witness for Kienlen, testified that he was chief of the outpatient clinic at the State Hospital; that he was a graduate of the Medical School of the University of Mexico and licensed to practice medicine in the Republic of Mexico; that he had one year of residency in psychiatry at the Cook County Hospital in Chicago; that he had training in psychiatry for two years at the Illinois State Psychiatric Institute, also in Chicago, and that when he finished such training he joined the staff of the State Hospital. He further testified that he took the examination for a license to practice medicine in Kansas and failed; that he took the examination given by the Council for Foreign Medical Graduates and failed to pass, and that he was not licensed to practice medicine in any state of the United States. However, the evidence showed that he had substantial training in psychiatry and practical experience in examining patients and determining whether they were suffering from any mental disorder or disease. He further testified that it was part of his work at the State Hospital to conduct psychiatric tests of patients, arrive at a diagnosis, and express an opinion as to whether the patient was suffering from a mental disorder.

Dr. Gonzales testified that Kienlen came to the State Hospital on September 7, 1965, and sought admission; that he examined Kienlen for about 45 minutes and reached the conclusion that he was "mentally ill and needed to be in the Hospital." He described Kienlen's condition as a "tenuous contact with reality" and "inability to adjust to life," and he admitted him to the State Hospital.

Dr. Gonzales further testified that after he had reached his conclusion as to Kienlen's mental condition, he examined the records of the State Hospital with respect to the prior periods he had been a patient there.

On cross-examination, the Assistant United States Attorney read to Dr. Gonzales from such records a discharge summary, made when Kienlen was discharged on January 30, 1959, as follows:

"The patient has been in and out of our institution since April, 1958, when he was transferred here from B.I.S. Each time the patient has received a diagnosis * * *. At no time dur-

---

1. Hereinafter referred to as the State Hospital.

ing his stay here did we find overt signs of a psychosis."

The Assistant United States Attorney then asked Dr. Gonzales if that would change his opinion. Dr. Gonzales answered, "No, that would not change my opinion."

The Assistant United States Attorney then stated that what he was about to read had reference to Kienlen's period in the Hospital immediately prior to the one that he had just inquired about. He then read the following to Dr. Gonzales from the State Hospital records:

"During the last few weeks, he (Kienlen) started to use the fact of his hospitalization to escape responsibility, stating literally 'I can't be held responsible as I am an inmate of a mental institution.' With this attitude, he stole the car of an aide, appropriated money from our secretary, and gambled it every place on the ground wherever he could find someone to gamble with. Although he had formed a good relationship with the attending physician, he nevertheless did not seem to attempt to absorb any of the common ethical standards. He did not learn from experience, nor profit by it. It is felt that this boy has had maximum benefits from hospitalization and that a mental hospital has nothing to offer which could help to change this boy's poor social adjustment."

The Assistant United States Attorney then asked Dr. Gonzales, "Would that change your attitude any?" The answer was "No."

The Assistant United States Attorney then read to Dr. Gonzales the termination summary of the period of one week of hospitalization after Dr. Gonzales admitted Kienlen, which read:

"During the present brief hospitalization Mr. Kienlen did not reveal any sign of acute psychosis, but showed rather strong traits of a sociopathic personality. He was demanding and created a great deal of difficulty. Because Mr. Kienlen's demands were not met, he requested his dismissal from the hospital. Although his evaluation had not been fully completed, it was felt that Mr. Kienlen was responsible for his actions, showed no acute mental disturbance and was able to face his charges. Since he was a voluntary patient and we had no court hold order on him, he was dismissed at his request on September 13, 1965."

The Assistant United States Attorney then asked Dr. Gonzales if that would change his opinion, and Dr. Gonzales answered in the negative.

There was a section in the State Hospital, known as the Adair Section, of which Dr. Arvid Sedrich was the chief. When Dr. Gonzales admitted Kienlen on September 7, 1965, he was sent to the Adair Section.

The Assistant United States Attorney read part of a letter from Dr. Sedrich, dated September 14, 1965, as follows:

"During his (Kienlen's) previous hospitalization here, we did not find any sign of an acute psychosis. His attitude during hospitalization was that of irritability and demandingness. He would lie, constantly demand privileges, and would not postpone any gratification. He acted badly around other patients, would not adjust to any hospital routine and would not accept authority. He felt he was not responsible for any misdemeanor, as he was an inmate of a mental hospital. He stole the car of a hospital aide, appropriated money from the secretary, which he gambled away during his last admission, and also the patient did not reveal any signs of an acute psychosis but showed rather strong traits of sociopathic personality. He was demanding from the very first day of admission, blamed everybody else for his trouble and rationalized his behavior, seeing himself as a victim of prejudice and unhappy circumstances.

With his bullying behavior and not following the hospital rules, he created a great deal of unrest in the ward. Because Mr. Kienlen's demands were not met, he requested his dismissal from the hospital. Although his evaluation had not been fully completed, it was felt that Mr. Kienlen was responsible * * * for his actions, showed no mental disturbance and was able to face * * *," etc.

The Assistant United States Attorney asked Dr. Gonzales if he had known of that letter, whether it would have changed his opinion. Dr. Gonzales answered in the negative.

Counsel for Kienlen made a timely objection to the Assistant United States Attorney so reading such statements, opinions and conclusions from the State Hospital records, on the ground they would invade the province of the jury and counsel for Kienlen would have no opportunity to test their credence or truth. While the objection was tersely stated, we think it was sufficient to and did bring to the court's attention that they would constitute evidence from witnesses who would not confront Kienlen at his trial; whose testimony counsel for Kienlen would have no opportunity to test by cross-examination; whom the jury would not see while testifying, and whose demeanor on the witness stand the jury would not observe.

Dr. Joseph Satten, after his qualifications, both by education and substantial experience in the field of psychiatry, were established, testified that at the request of counsel for Kienlen he examined Kienlen with respect to his mental condition on December 9, 1965.[2] Dr. Satten testified that he examined Kienlen on two occasions, each for a period of about two hours; that he also reviewed the record of the Kansas Boys Industrial School, which included a report on the mental condition of Kienlen by Dr. Ebaugh, dated February 1956,

and a psychiatric report of Dr. Stuntz, dated March 5, 1958; that he also reviewed the records of the State Hospital covering four periods in which Kienlen was an inmate of such Hospital, being April 16 to June 4, 1958; July 15 to October 3, 1958; December 3, 1958, to January 30, 1959, and September 7, 1965, to September 13, 1965; that they included a case summary dated May 17, 1958, and a psychiatric report dated July 15, 1958; that he also examined an outpatient report on Kienlen from the period of September 7 to September 13, 1965, and a record of a fifth admission on January 14, 1966.

In addition to that, he reviewed the records of the Medical Center for federal prisoners at Springfield, Missouri, which included a summary of Kienlen's service in the Marine Corps, reports of psychiatric examinations of Kienlen while he was in the Marine Corps, dated August 29, 1963, and September 26, 1963; a psychiatric report of an examination of Kienlen dated January 3, 1966; a report of psychological tests by Dr. Geil, dated February 24, 1966, and a summary of the staff's opinion, dated February 21, 1966; that he also reviewed the psychiatric report on Kienlen by Dr. Jobson, dated April 8, 1966. He testified that as a result of his examination of Kienlen and his review of the records above stated, it was his opinion that Kienlen was suffering from a mental disorder on December 9, 1965, and was not able to control his behavior to conform it to the law on that date.

Counsel for Kienlen contend that the reading of such Hospital records and the letter of Dr. Sedrich by the Assistant United States Attorney in his questions to Dr. Gonzales violated Kienlen's constitutional right to be confronted with the witnesses against him.

A major reason for the provision of the Sixth Amendment that "in all criminal prosecutions, the accused shall enjoy the right * * * to be confronted

---

2. The record does not show the date of Dr. Satten's examination.

with the witnesses against him" is to give a defendant charged with a crime an opportunity to cross-examine the witnesses against him.[3] Another reason is to give the jury, which is the sole judge of the credibility of the witnesses and the weight to be given their testimony, an opportunity to see a witness when he testifies and to observe his demeanor on the witness stand.[4]

The issue as to Kienlen's mental condition on December 9, 1965, presented a close question. Its determination rested largely on the testimony of two expert witnesses for the Government and two expert witnesses for Kienlen. At the first trial, the jurors were unable to agree. The discharge summaries prepared by psychiatrists of the State Hospital and the statements in Dr. Sedrich's letter, if considered by the jury in resolving that issue, must have been very damaging to Kienlen's claim that he was not guilty because of insanity when the robbery was committed. While the court stated to the jury that they were admitted only as a test of the quality of the opinion of Dr. Gonzales and were not "offered to indicate the truth of the statements made," we think the jury would have had great difficulty in making that distinction. The jurors were not advised, as they should have been, by a proper admonition at the time they were read by the Assistant United States Attorney to the jury, and repeated in the general charge to the jury, that they should not be considered by the jury as any proof whatsoever that Kienlen was not suffering from any mental disease and was capable of controlling his conduct on December 9, 1965, when the robbery was committed. Indeed, it would have been well to explain to the jury that it should not consider such summaries and statements as evidence against Kienlen, because they were not made under the sanctity of an oath, and that to so consider them would violate Kienlen's constitutional right to be confronted at his trial with the witnesses against him and have them cross-examined by his counsel, and the jury afforded an opportunity to see them on the witness stand and observe their demeanor while testifying.

Counsel for the United States could have called as witnesses Dr. Sedrich and the psychiatrists who prepared the statements and discharge summaries in the Hospital reports and elicited their testimony with respect to the matters set forth in the letter, reports, and summaries, and then cross-examined Dr. Gonzales with respect to the effect of the matter in such letter and records on his opinion. Instead, he resorted to a subtle way to get them before the jury by cross-examination. We do not intend to suggest any intentional impropriety, but we do think the question in this case could have been avoided by such a course as we suggest he could have taken.

We think, in view of the closeness of the issue and the lack of a clear-cut instruction to the jury that they could not consider the summaries, reports, and letter as evidence of Kienlen's freedom from mental disorder and of his ability to know the difference between right and wrong and to control his conduct on December 9, 1965, there was a substantial risk that the jury considered the extrajudicial statements in determining whether Kienlen was free from mental disorder, knew the difference between right and wrong, and was capable of controlling his conduct on December 9, 1965.

Accordingly, we reverse the order and remand the case, with instructions to vacate the conviction and sentence and grant Kienlen a new trial.

---

3. Bruton v. United States, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476.

4. Duggar v. United States, 10 Cir., 434 F.2d 345, (decided October 29, 1970).