## STEPHEN WYATT GREGORY *v.* STATE OF MARYLAND

[No. 1411, September Term, 1977.]

*Decided September 6, 1978.*

The cause was argued before MASON, WILNER and COUCH, JJ.

*John G. Gill, Jr., Assigned Public Defender,* for appellant.

*Deborah K. Handel, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and

*Timothy E. Clarke, Deputy State's Attorney for Montgomery County,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

The Citizens Bank of Maryland has a branch office located in the Blair Plaza Shopping Center, in Silver Spring. Shortly after 6:00 p.m. on February 9, 1977, Stephen Wyatt Gregory, the appellant, entered that office carrying two rifles, one under each arm.

His first act was to order the several customers then in the bank to leave, which, without undue hesitation, they did. He found himself, then, alone in the lobby and separated from the bank employees by a floor-to-ceiling partition, the major part of which consisted of bullet-proof glass. At his direction, however, the assistant manager opened a door connecting the lobby with the office and working areas; and appellant thereupon proceeded to take the assistant manager and seven other employees hostage. The silent alarm was immediately activated, and the bank was soon surrounded by the police.

It quickly became apparent that appellant did not intend to rob the bank, although what, if any, motive he did have remained a mystery. During the course of the next six-and-a-half hours, appellant spoke on the telephone with assorted newsmen, a friend, his mother, and with Sergeant McFee, of the Montgomery County Police Department. Every now and then, he fired his rifles from inside the bank, discharging in all some 205 rounds, mostly at objects in the bank. Fortunately, he did not injure or kill anyone, although he easily could have done so. Almost from the beginning, and periodically throughout the siege, he allowed his eight hostages, one by one, either to escape or to leave with his permission. Finally, an hour or so after the last hostage left, appellant put down his weapons and was captured by the police.

As a result of this bizarre and frightening episode, a 37-count indictment was returned against appellant, charging him with nine counts of kidnapping, nine counts of false imprisonment, seven counts of assault with intent to murder, and twelve counts of assault. To each count, appellant pled

not guilty and not guilty by reason of insanity. Trial was held before a jury in the Circuit Court for Montgomery County, at the conclusion of which appellant was convicted of eight counts of false imprisonment and four counts of assault.[1] Upon his eight convictions for false imprisonment, appellant was sentenced to imprisonment for eight consecutive terms of two years each (total: 16 years), and upon the assault convictions, he was sentenced to imprisonment for four concurrent terms of two years each.

Appellant presents two questions in this appeal:

1. Whether or not the admission of opinions and/or conclusions of three psychiatrists who were not called to testify on the issue of legal responsibility violated appellant's right to confrontation as guaranteed by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights; and

2. Whether it was error for the trial judge to refuse to permit cross-examination as to or introduction by appellant of lay opinions as to sanity and/or rationality and to present testimony as to certain previous episodes of appellant's life.

### (1) *Right of Confrontation*

There was no significant dispute about what occurred in the bank; appellant did not contest that he, in fact, did those things which the State and its witnesses claimed he had done. His sole defense was that he was not responsible for his acts — that he was legally insane at the time he committed them. Appellant's "sanity", therefore, was the only real issue in the case; and it was a strongly contested one.

In accordance with Maryland law (Code, art. 59, § 25), once appellant entered his plea of not guilty by reason of insanity, he was referred to Clifton T. Perkins State Hospital for evaluation as to his "responsibility" at the time of the incident.[2] On June 14, 1977, the Superintendent (Dr. LeBow)

---

1. The court directed a verdict of acquittal on the nine counts of kidnapping at the end of the State's case, and the jury found appellant not guilty on the remaining eight counts.
2. Appellant had previously been admitted to Perkins by order of the District Court for evaluation as to his competence to stand trial. He was found to be competent and then returned to the county detention center.

and the Clinical Director (Dr. Silver) of Perkins reported to the court, and to counsel, that:

> "No evidence for psychosis or organacity was elicited. Psychological testing revealed him [appellant] to be of average intelligence with a personality picture of immaturity, histrionics, and low frustration tolerance. It was the *unanimous* opinion of the medical staff that the patient is suffering from a personality disorder characterized variously as hysteric, passive-aggressive and antisocial.

> "It was the *unanimous* opinion of the medical staff that, at the present time, Mr. Gregory is able to understand the nature and object of the proceedings against him and assist in his own defense. It was the further *majority* opinion of the medical staff that at the time of the alleged offense the patient was *not* suffering from a mental disorder which would have caused him to lack substantial capacity to either appreciate the criminality of his conduct or conform his conduct to the requirements of the law." (Emphasis supplied.)

Of critical significance, in terms of appellant's defense of insanity, was the medical staff conference that occurred on June 13, 1977; for, in large part, it was at, and as a result of, that conference that the medical opinions described in Dr. LeBow's letter were developed and recorded. The report of that conference shows that the following reports were submitted: (1) Psychiatric Case Workup by Dr. Adamo; (2) Psychological Report by Mr. Morse; (3) Social Service Summary by Ms. Collins; and (4) Nursing Service Summary by Mr. Bouldin. The report then concludes:

> "After interviewing the patient, the following opinions were expressed:

> Dr. Lebow:          Hysterical Personality.
>                     Competent and Responsible.

| | |
|---|---|
| Dr. Silver: | Hysterical Personality with anti-social trends. Competent and Responsible. |
| Dr. Adamo: | Hysterical Personality. Depressive Neurosis. Competent and Not Responsible. |
| Dr. Hertzberg: | Passive-aggressive Personality. Competent and Responsible. |
| Dr. Fitzpatrick: | Passive-aggressive Personality. Competent and Responsible. |
| Dr. Abbas: | Antisocial Personality. Competent and Responsible. |
| Final Diagnosis: | Personality Disorder characterized variously as hysteric, passive-aggressive and antisocial. |
| Recommendations: | This patient is competent for trial. He was responsible at the time of the alleged offenses (majority opinion). Return to Court custody. |

/s/_____
Stuart Silver, M.D., Clinical
Director"

The "bottom line", so to speak, of this conference, and ultimately of the hospital report itself, was that (1) all six psychiatrists agreed that appellant had a mental disorder, (2) five of the doctors, expressing four somewhat varying diagnoses, considered appellant nevertheless to be competent and responsible, and (3) one doctor (Adamo), expressing a fifth diagnosis, believed him to be competent but not responsible.

At the commencement of trial, both sides agreed to an "order of proof" consistent with that approved in *Hawkins v. State*, 34 Md. App. 82 (1976); namely: the defense would introduce the issue of "sanity" in its case-in-chief, and the State, in rebuttal, would respond with its evidence on that

issue. In accordance with that procedure, appellant offered the testimony of four psychiatrists. Dr. Brian Crowley, employed by appellant, had examined appellant prior to his second admission to Perkins. He testified that appellant suffered from the cumulative effect of a mental depression (depressive neurosis), a serious personality disorder of mixed type, and being "under the influence of ethyl alcohol to some substantial extent I think very considerable on that occasion." Crowley opined that appellant's mental disorder caused him to lack substantial capacity to conform his conduct to requirements of law on the day in question, and that his opinion would be the same even if he assumed that appellant had not been under the influence of alcohol.

Following Dr. Crowley was Dr. John McCormack. Dr. McCormack had been on duty at a hospital near the shopping center, and had been called to the scene by the police when appellant, while still in the bank with the hostages, had indicated a desire to talk to a psychiatrist. He had occasion to observe what occurred, including appellant and his demeanor, and had also talked with the police, with appellant's parents, and with appellant's girlfriend. In addition, he had listened in on the various telephone conversations with appellant. Although he had not examined appellant, Dr. McCormack was permitted to express his opinion that appellant suffered from a mental disorder (which he did not define more specifically than "a depression") and that, on the evening in question, appellant was unable to conform his conduct to the requirements of the law.[3]

Next, Dr. Adamo, the psychiatrist from Perkins who had done the Psychiatric Case Work-up (and the only one of those present and "voting" at the June 13 medical staff conference who believed appellant to be not responsible) testified. Dr. Adamo had interviewed appellant on three occasions during his stay at Perkins — twice on June 10 (which was prior to the staff conference) and once on June 15 (after the conference). He stated that appellant had a mental disorder,

---

3. Dr. McCormack disagreed with Dr. Crowley's opinion that appellant was intoxicated at the time.

which he diagnosed as a depressive neurosis, and that this disorder was so severe as to impair his ability to appreciate the criminality of his conduct and to conform his conduct to the requirement of law.

It was during the State's cross-examination of Dr. Adamo that the confrontation issue first arose. Over appellant's objection, constitutionally based, the full hospital record from Perkins, including the minutes of the medical staff conference in which the opinions of all six psychiatrists were recorded (see *supra*), was admitted into evidence. Also over objection, Adamo testified that the other psychiatrists at the conference did not agree with his opinion that appellant was not responsible, but he was not asked, and did not state, what the opinions of the other psychiatrists were.

Finally, Dr. Gordon Livingston, a psychiatrist employed by the defense, testified that appellant had a combination of two mental disorders—an impulsive character disorder of long standing and a depression—and that, as a result of those disorders, at the moment he entered the bank, he lacked substantial capacity to conform his conduct to the requirement of the law.

In rebuttal, the State produced Dr. LeBow and Dr. Leonard Hertzberg. Dr. LeBow agreed with Dr. Livingston's diagnosis that appellant suffered from a "character impulse disorder characterized by hysterical and antisocial trends" which, he said, better expressed his own earlier diagnosis of "hysterical personality." However, he did not believe that this disorder rendered appellant "not responsible"—that it "interrupt[ed] his thinking to the extent that he misperceived reality; that he would be unable to understand what the dictates of society were; and that he would not have been able to work out some alternative way of handling the problems that he was facing in a way other than performing an antisocial act." Acknowledging that appellant may have been depressed, Dr. LeBow did not consider the depression to be a "psychiatric depression".

Dr. Hertzberg stated that appellant had a "mixed bag" of personality disorders, but that he did not have a mental

disorder of such magnitude that he lacked substantial capacity to appreciate the criminality of his actions or to conform his conduct to the requirements of the law. Dr. Hertzberg's original opinion was that appellant's disorder was a "passive-aggressive personality". At trial, however, he modified his diagnosis to that of "hysterical personality", although this did not affect his ultimate opinion that appellant was "responsible."

Although both Dr. LeBow and Dr. Hertzberg testified about Dr. Adamo's conclusions, and indicated their disagreement with his opinion as to appellant's "responsibility", neither of them testified about the opinions rendered by the other three State psychiatrists present at the medical staff conference. Except for the brief statement by Dr. Adamo, on cross-examination, that the other doctors present at the conference did not share his opinion, the only evidence as to the existence of those three "out of court" opinions came from the hospital record.[4] The jury therefore had before it the testimony of four psychiatrists claiming appellant was "insane", that of two psychiatrists claiming he was "sane", and a hospital record showing that three more psychiatrists also believed that appellant was "sane".

It is impossible, of course, for this Court to know what, if any, weight the jury may have given to the opinions of the three absent psychiatrists. The record, in fact, is silent as to whether the jury ever saw the report of the medical staff conference, or actually became aware of what these opinions were.[5] Nonetheless, the report was in evidence, and we are not at liberty to assume that the jury was unaware of its contents. We must therefore proceed upon the premise that the jury was aware of, and considered, the fact that three psychiatrists, not present in court to be observed by the jury, stared upon by appellant, and cross-examined by counsel, had

4. The questioning of Dr. Adamo on this point came after appellant's objection to the admission of the hospital report had been overruled. Appellant objected also to this line of cross-examination of Dr. Adamo but that objection too was overruled.

5. The record reflects no mention being made of these three opinions in the court's instructions to the jury or in the closing arguments of counsel.

expressed the opinion that appellant was responsible for his acts and, under the virtually uncontradicted evidence, therefore guilty as charged.

The court believed that the issue raised by appellant's objection to the hospital record was controlled by *Dunn v. State,* 226 Md. 463 (1961), and overruled the objection on the basis of that case. Actually, *Dunn* is not precedent for such action, as it did not involve an objection based upon the constitutional right of confrontation. The objections raised to the admission of the hospital report there were grounded upon hearsay, relevance, and the qualifications of the declarants. Those are not the issues here.

It is clear, beyond dispute, that the hospital record, once properly authenticated, was not rendered inadmissible because it was or contained hearsay. As against a hearsay objection, it was admissible as a business record under Courts article § 10-101, and possibly as well as a public record under § 10-204. *Dunn* clearly establishes that principle. The question here is whether, notwithstanding the admissibility of the record generally under an exception to the hearsay rule, that part of it recording the opinions of Drs. Silver, Fitzpatrick, and Abbas as to appellant's "sanity" should not have been admitted because it denied appellant the right to confront those three witnesses against him.

We are dealing here with Article 21 of the Declaration of Rights of Maryland, and the Sixth Amendment to the United States Constitution. In terms of the right of confrontation, these two measures of organic law are virtually identical and have been held to express "the same right". *Crawford v. State,* 282 Md. 210 (1978). *See also Jackson v. State,* 31 Md. App. 332 (1976). Article 21, adopted as part of our first Constitution in 1776, provides, in relevant part, that "in all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses against him. . . ." The Sixth Amendment provides, again in relevant part, that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ."

In comparison with most of the other declarations of personal liberty that comprise our Bills of Rights, State and

Federal, this one has received, until recently, very little attention. Although, as with most of the "rights" now associated with the broader concept of due process of law, the right of confrontation arose in the common law, the history of its development is not so clear.[6] It does seem clear,

6. How, when, and with what degree of consistency the right of confrontation became an accepted part of the English common law is a matter of some dispute. Heller (*The Sixth Amendment to the Constitution of the United States,* p. 104) states that this was a common law right "which had gained recognition as a result of the abuses in the trial of Sir Walter Raleigh", a statement referred to by the Supreme Court in California v. Green, 399 U. S. 149 (1970). *See* p. 157, but, *cf.* concurring opinion by Justice Harlan at p. 177. Other writers suggest a somewhat earlier, though sporadic, development. (Raleigh's trial was in 1603.)

Originally, the common law petit jurors were themselves knowledgeable witnesses, brought together to declare upon oath their opinion as to the guilt or innocence of the accused. Over time, the jury assumed more of the role it has today—relying on evidence presented to it in court, rather than upon its own knowledge about the events in question, or that gained by its private extra-judicial inquiries, in order to try the facts and determine guilt or innocence. The development of both the hearsay rule generally, and a particular right of confrontation, as we know it today, had, of course, to await this more basic transformation. This process was a gradual one occurring during the Fifteenth and Sixteenth Centuries. *See* 5 Wigmore § 1364. It was common practice then for witnesses to be examined under oath before a justice of the peace or, in homicide cases, before a coroner, their testimony being recorded in the form of an affidavit or deposition. The defendant may or may not have been present at this pre-trial hearing. The question was whether, and under what circumstances, these affidavits and depositions were later admissible at trial without the witness himself being present to testify.

Four statutes enacted during the 1550's were particularly relevant. The statute 5 & 6 Edw. VI, c. 11 (1552), prohibited an indictment, arraignment, condemnation, or conviction for treason unless the offender be accused by two lawful accusers "which said accusers at the time of the arraignment of the party accused, if they be then living, shall be brought in person before the party so accused, and avow and maintain that they have to say against the party, to prove him guilty of the treasons or offenses contained in the bill of indictment laid against the party arraigned; unless the said party arraigned shall willingly without violence confess the same." It has been asserted that this statute was the product of the Duke of Somerset's trial for high treason and felony a year earlier, at which the Duke was convicted of felony upon the reading of depositions of absent witnesses. *See* 5 Wigmore § 1364, p. 21, quoting the account of Bishop Burnet arguing in *Fenwick's Trial,* 13 How. St. Tr. 537, 752 (1696): "Upon which it was that the following parliament enacted that the accusers (that is, the witnesses) should be examined face to face, if they were alive." Reeves (*History of the English Law* (1787), Vol. IV) contends that, by making an "accuser" compellable as a witness, this statute created a new right, stating, at p. 502: "The very stile of stat. 5 and 6 Ed. VI, c. 11, seems to intimate, that the bringing before the court the accusers who had been examined before the grand jury, was something new."

This statute of Edw. VI applied only in cases of treason; and even in that limited context, there is some question as to whether its benefits were not soon abrogated by a subsequent enactment during the joint reign of Philip

however, that this right had been fairly well established in

and Mary. This was 1 & 2 Ph. & M., c. 10 (1554), section 7 of which provided that all trials for treason "shall be had and used, only according to the due order and course of the common laws of this realm, and not otherwise. . . ." Section 11 of the Act appeared to repeat, and indeed to strengthen, the right granted in the earlier enactment, by providing that upon the arraignment of any person for any of the treasons mentioned in the Act, all persons "who shall hereafter write, declare, confess, or depose any thing or things against the person to be arraigned, shall, if living and within the realm, be brought forth in person before the party arraigned if he require the same, and object and say openly in his hearing, what they or any of them can against him, for or concerning any of the treasons contained in the indictment. . . ."

According to Reeves (p. 495), the judges severely circumscribed the effect of this seemingly clear mandate in section 11, and construed the language in section 7, and therefore the statute as a whole, as repealing that part of the statute of 5 & 6 Edw. VI that required the presence of two witnesses at trial or arraignment. Wigmore, citing rulings made in a number of the infamous State Trials (Throckmorton's Trial, the Duke of Norfolk's Trial, Abington's Trial, Sir Walter Raleigh's Trial, and Lilburne's Trial) supports Reeves in that conclusion. 5 Wigmore § 1364, pp. 21, 22.

Some of the more traditional commentators on the English common law suggest, however, that, although the right of confrontation recognized in 5 & 6 Edw. VI may subsequently have been ignored in cases of treason, it nevertheless remained applicable in ordinary felony trials; and they point to two other relevant enactments during the reign of Philip and Mary. These are 1 & 2 Ph. & M., c. 13, which required justices of the peace to examine witnesses in any felony case before releasing the accused on bail or recognizance, and 2 & 3 Ph. & M., c. 10, authorizing these justices to bind over material witnesses in order to assure their presence at trial so that they may "give evidence against the party."

Chitty (1 Chitty Crim. Law, 1819, p. 80) states: "Before the statutes of Philip and Mary, depositions thus taken before justices of the peace, in the county where a felony was committed, were not admissible in evidence even when death or some absolute necessity prevented the witness from attending." See also King v. Inhabitants of Eriswell, 3 T. R. 711 (1790); Reeves, pp. 477-506. Hawkins (2 Pleas of the Crown, ch. 46, 1721) falls short of supporting that proposition, but neither does he support the assertions of Reeves and Wigmore as to the effect of 1 & 2 Ph. & M., c. 10. Although noting that " [t]here are many Instances in the Reigns of Queen Elizabeth and King James I wherein the Depositions of absent Witnesses were allowed as Evidence in Treason and Felony, even where it did not appear but that the Witnesses might have been produced viva voce," he states generally, as being "settled", that the testimony of "an Informer" taken before a justice of the peace or a coroner, pursuant to the statutes of Philip and Mary, may be offered in evidence in a felony case if (and presumably only if) the court was satisfied "that such Informer is dead, or unable to travel, or kept away by the Means or Procurement of the Prisoner. . . ." He states further that "it is not sufficient to authorize the Reading [of] such an Examination to make Oath that the Prosecutors have used all their Endeavors to find the Witness, but cannot find him."

Speaking of the second of the Philip and Mary statutes (1 & 2 Ph. & M., c. 13), Hale (2 Hale's Historia Placitorum Coronae) appears to have agreed generally with Hawkins' analysis. He states, at p. 283: "These examinations and informations thus taken and returned may be read in evidence against the prisoner, if the informer be dead, or so sick, that he is not able to travel, and oath thereof be made; otherwise not." (Emphasis supplied.)

the common law prior to the time of the American Revolution.[7]

It has been suggested, declared, and assumed that the right of confrontation was an outgrowth of the hearsay rule generally,[8] which may well be the case. To some extent, at least, their purposes are similar. But, however entwined the development of these two concepts may have been in their formative periods, the evidence is quite clear that, at least by the late 1600's, the right of confrontation was considered to be something more than merely a part of the overall rule against the use of hearsay. It was much more particular, being a right peculiar to defendants in certain criminal cases, rather than to litigants, or even defendants, generally; and

---

To the extent that the practice of compelling the attendance of available witnesses was suspended, in lieu of using *ex parte* affidavits or depositions taken before the justice of the peace or the coroner, upon the pretense of the statutes of Philip and Mary, that pretense disappeared, at least in cases of treason, with the enactment of 7 & 8 Wm. III, c. 3, in 1695. This statute expressed nearly every right now contained in the Sixth Amendment—to obtain a copy of the indictment, to have the assistance of counsel, to have compulsory process for the production of witnesses. Section II of the Act provided that, after March 20, 1696, no person may be indicted, tried, or attainted of High Treason or misprision of such treason "but by and upon the Oaths and Testimony of Two lawful Witnesses" unless the accused voluntarily confessed guilt or remained mute. Section VII further provided that all such accused persons "shall have the like Process of the Court where they shall be tried, to compel their Witnesses to appear for them at any such Trial or Trials, *as is usually granted to compel Witnesses to appear against them."* (Emphasis supplied.)

In summary, it would appear that the practice (if not the right) of requiring the appearance of witnesses giving evidence against an accused, at some stage of the proceeding, and the concomitant inadmissibility of their extra-judicial depositions and affidavits in the absence of their appearance, was initially established before the 1600's that during the reigns of Elizabeth I and James I this practice was apparently suspended, at least in cases of treason, but that it was re-established as a matter of law by the end of the Seventeenth Century with the actment of 7 & 8 Wm. III, c. 3. *See, in general,* 5 Wigmore § 1364, p. 20, *et seq.;* 4 Blackstone *Commentaries,* p. 350, *et seq.*

7. *See, for example,* 2 *Alex Br. Stat.* 821 *(British Statutes in Force in Maryland),* indicating that the statute 7 & 8 Wm. III, c. 3, "was practiced in the Province...." *See also Crime and Punishment in Early Maryland,* R. Semmes (1938), describing the trial of one Pope Alvey in 1666 for stealing a cow. Semmes reports that, after the jury was sworn, some witnesses, whose affidavits were read to the jury, appeared and testified. This would indicate that the general practice described by Hawkins, Chitty, and Hale—of having the witness brought into court to authenticate his deposition and be cross-examined with respect to it—was prevalent in the pre-revolutionary province as well.

8. *See* 5 Wigmore § 1364; California v. Green, 399 U. S. 149, 156 (1970); McCormick *Evidence,* 2nd Ed., §§ 245, 252.

it had to do not with the quality of the evidence given by witnesses (whether it was upon personal knowledge, for example), but rather with the requirement that the witness be produced—that his testimony be *viva voce*. The suggestion that the right of confrontation is no more than a particular expression or emanation of the hearsay rule does not find substantial support historically.

More significant is the fact that a number of the conventions that drafted the first State constitutions apparently considered the right of confrontation to be something apart from the common law hearsay rule; for, while most of them either assumed or wrote into the early constitutions the right of the inhabitants to much of the common law of England (which included, of course, the rules against hearsay evidence), many of them separately declared the right of an accused to be confronted by the witnesses against him as part of their Declaration of Rights.[9] Unfortunately, there has been little in the way of thorough research done with respect to the inclusion of this particular right in the early State Constitutions,[10] and it is not entirely clear, therefore, what the framers had in mind when they drafted this clause.[11] The same paucity of information exists

---

**9.** *See, for example,* Va. Decl. of Rights (1776)—the first adopted by the 13 original States—art. 8; Md. Decl. of Rights (1776), art. XIX; Pa. Decl. of Rights (1776), art. IV; Del. Decl. of Rights (1776), § 14; N.C. Decl. of Rights (1776), art. VII; Vt. Decl. of Rights (1777), art. X; Mass. Decl. of Rights (1780), art. XII; N.J. Decl. of Rights (1776), art. XVI; N.H. Bill of Rights (1783), art. XI. Altogether, nine of the thirteen original States prefaced their first Constitutions with a Bill or Declaration of Rights, although not all (*e.g.,* Connecticut) contained the specific right of confrontation. As of 1965, every State except Idaho had either statutory or constitutional language reflecting the right of confrontation. *See* 5 Wigmore § 1397; *also* 113 Pa.L.Rev. 741 (1965). For provisions adopting the relevant body of the common law of England, *see* Md. Decl. of Rights (1776), art. III; N.J. Decl. of Rights (1776), art. XXII; Del. Const. (1776), art. 25. In some States, *e.g.* Virginia, the adoption of the common law was achieved by statute rather than by Constitution. *See* letter from James Madison to George Washington, October 18, 1787, published in *The Writings of James Madison,* Vol. 5, pp. 11-15.

**10.** *See, however,* Schwartz, *The Bill of Rights: A Documentary History* (1971); Heller, *supra,* note 5.

**11.** The published proceedings of the 1776 Maryland Convention shed no light at all on the purpose or scope of the confrontation clause now contained in Art. 21. The provisions appear to fall generally into two categories. Most speak of the right to "confront" or "be confronted with" the witnesses and/or accusers; others, such as Delaware and Massachusetts, speak of the right to "meet the witnesses ... face to face." Is this a difference without a distinction?

with respect to the formulation of the Sixth Amendment to the U.S. Constitution. Although in a few of the conventions called to consider ratification of the Federal Constitution in 1787-1788, notably Pennsylvania, Massachusetts, Virginia, New York, and Maryland, opponents of the new Charter criticized its lack of a Bill of Rights, there was little, if any, discussion about the right of confrontation in particular.[12] Moreover, although we know that the first ten amendments, initiated in and proposed by the First Session of Congress, were derived largely from the proposals submitted by James Madison, supplemented by those emanating from some of the State ratifying conventions, the Annals of Congress are virtually silent with respect to what the Congress believed the right to confrontation entailed.[13]

We thus have two provisions of organic law—one State and one Federal—nearly identical in language, expressing what, on more than one occasion, the Supreme Court has considered to be "one of the fundamental guarantees of life and liberty" [14] with precious little legislative history to point out their meaning. This lack of authoritative direction, unfortunately, had led courts, and commentators, into considerable confusion as to just what it is, or was, that this right was designed to protect: was it merely the right of the accused to be present when evidence was given against him; was it the right to require that evidence be by testimony rather than by document; was it the right to demand a face-to-face confrontation with the witness; was it the right

---

**12.** *See, for example, Address to the People of Maryland,* April 21, 1788,—an appeal by the dissenters in the State Ratifying Convention who desired the inclusion of a Bill of Rights; *also, Letters of Luther Martin,* particularly March 21, 1788, published in Schwartz, *supra,* n. 9, Vol. I, p. 493; and generally Schwartz, *supra;* Elliot's *Debates in the Several State Conventions on the Adoption of the Constitution.* Perhaps as a result, the proponents of the Constitution did not address the question either, but wrote or spoke in similar generalities about a Bill of Rights. *See, for example, Federalist* No. 84 (Hamilton), *The Writings of James Madison, supra,* n. 9.

**13.** *See* 1 *Annals of Congress,* pp. 440-468, 690-699, 784-809, 73, 77, 80. No debate of significance was recorded in the Senate as to any of the proposed amendments. There was much greater discussion recorded in the House of Representatives, but little of it focused on the right of confrontation. *Compare* concurring Opinion of Harlan, J. in California v. Green, 399 U. S. 149, at pp. 174-179.

**14.** Kirby v. United States, 174 U. S. 47 (1899). *Also* Pointer v. Texas, 380 U. S. 400 (1965); Dutton v. Evans, 400 U. S. 74 (1970).

to cross-examine the witness? Was its purpose to assure a certain quality of evidence used to convict, to allow the trier of fact the opportunity to gaze upon the witness in aid of determining his credibility, or perhaps simply to encourage prosecutorial fairness and diligence? The application, and indeed the description of the right, as well as its relationship to the hearsay rule, has, historically, come to depend upon how the courts have viewed its function.

Until *Pointer v. Texas,* 380 U. S. 400 (1965), the Sixth Amendment was not applicable to the States. This meant that the pre-1965 nature, scope, and meaning of the right of confrontation in Maryland developed solely from the opinions of the Court of Appeals in the context of Article 21 of the Declaration of Rights.

The course of development of the State provision was marked in *Johns v. State,* 55 Md. 350 (1881). The defendant there was a tax collector, who was charged with failing to remit all that he had collected. The statute making such a defalcation a crime also provided that the Comptroller's certificate showing the amount of default constituted *prima facie* evidence of a defalcation. Johns objected to the admission of the Comptroller's certificate, claiming that his right of confrontation under Article 21 had been violated. The Court rejected this defense, however, stating, at page 360:

> "In declaring that the party accused shall have the right to be confronted with the witnesses against him, that provision of the Declaration of Rights is not to be understood as excluding all other evidence except oral evidence of witnesses produced in court. Such has never been its interpretation, nor does the language warrant it. It is only where the prosecution is to be maintained by the testimony of living witnesses that they are required to be produced in court, confronted with the accused, and deliver their testimony under the sanction of an oath, and be subject to cross-examination. In other words, no witness shall give his testimony in secret, or out of the presence of the accused; and no party shall be

put upon his trial upon mere hearsay evidence; but the witness shall be produced, and be subject to all the tests that the law has devised for the full disclosure of the truth. In all this, however, there is nothing to exclude other evidence recognized and sanctioned by the law, as fit and appropriate means of establishing the truth of the charge against the accused."

Presumably in this context—that where the testimony of a living witness is involved, the witness must be produced—the Court went on to hold, at page 362:

"Indeed, there can be no question of the power of the Legislature to change the common law rules of evidence, or to prescribe new rules, altogether different from those known to the common law; and it may declare what proof shall be deemed, or taken as *prima facie* sufficient to establish any particular fact, even in criminal cases."

The Court next considered Article 21 in *Dutton v. State,* 123 Md. 373 (1914), an outrageous situation in which the defendant, accused (and convicted) of a capital crime, was excluded from the courtroom while the chief witness against him testified. This did not involve the question of documentary evidence, but only whether the accused had a right to be present to confront a witness giving evidence against him. Citing *Johns v. State, supra,* as authority, the Court reversed the conviction.[15]

In *Jones v. State,* 205 Md. 528 (1954), the Court interpreted *Johns* as concluding that "the right of confrontation does not apply to documentary evidence, and that the Legislature has the constitutional power to change the common law rules of evidence as to what documents are admissible and the weight

---

**15.** The right of an accused electing a jury trial to be present at every stage of his trial has been inferred independently from Article 5 of the Declaration of Rights. *See* Duffy v. State, 151 Md. 456 (1926); Brown v. State, 225 Md. 349 (1961); Midgett v. State, 216 Md. 26 (1958); Brown v. State, 272 Md. 450 (1974). To that extent (where there is a jury trial) there is an overlap between the two provisions. This right is also, of course, implicit from the due process clause of the Fourteenth Amendment, whether or not the trial is before a jury.

to be attributed to them, even in criminal cases." The defendant in *Jones* was charged with performing an illegal abortion. In order to bolster the "victim's" uncertain testimony as to her pregnancy, the State called the head of the department of obstetrics at the hospital in which the "victim" was treated, who brought with him the hospital record, for the purpose of establishing that the "victim" had, in fact, been pregnant. This witness had not himself examined the woman. An objection was made to any testimony by this physician based upon the hospital record on the ground that the record was not made as a result of an examination by that doctor and because it was hearsay. No mention was made of the right of confrontation. In point of fact, the hospital record was never offered into evidence, and the doctor's testimony was given without any reference to it.

Despite both the lack of objection based upon Article 21, and the fact that the record itself was neither offered nor referred to, the Court concluded that, had it been offered, it would have been admissible under the business record statute, and that that statute, making the hospital record admissible, did not violate Article 21. *Johns* was cited and construed in that context. In light of the factual background of the case, it is difficult to regard the sweeping statement that "the right of confrontation does not apply to documentary evidence" as anything more than *dicta,* the support for which is not altogether clear.[16]

---

16. The Court cited five out-of-State cases as authority. In State v. Guaraneri, 194 A. 589 (R.I., 1937), appellant, charged with performing an abortion, contended that the admission of a hospital record "under any circumstances" violated her right of confrontation. The court held that, if properly authenticated and "restricted to the purpose and within the limits for which it may properly be used", the record was competent evidence. In People v. Nisonoff, 59 N.E.2d 420 (N.Y., 1944), also an abortion case, in which the victim died, the disputed evidence was an autopsy report prepared by an assistant medical examiner who had died prior to trial. The *opinion* of the examiner as to cause of death was not offered—only his factual findings. The chief medical examiner appeared in court and, based upon the findings of his late assistant, testified as to cause of death. People v. Purcell, 70 P. 2d 706 (Cal., 1937) involved the question of whether a public record was admissible to show a prior conviction. In judging that question, the court noted that the right of confrontation was not a *constitutional* right in California at that time. State v. Hayes, 18 A. 2d 895 (Conn., 1941) involved official municipal accounting records; and Cochran v. Commonwealth, 94 S. E. 329 (Va., 1917), involved the business records of an express company offered to show that the defendant had received certain contraband. Cited also was Snyder v. Massachusetts, 291 U. S. 97, discussed *infra.*

*Jones* was cited, without comment, in *Dunn v. State, supra,* as authority for the proposition that the business record statute was applicable in criminal cases. This was, as previously noted, in the context of an objection based on hearsay, rather than confrontation, grounds.[17] Despite this somewhat shaky development, however, as of 1965, the law of Maryland (*Johns* and *Jones*) seemed to be that the right of confrontation did not apply to documentary evidence in any form, including hospital records; and that, if a document was otherwise admissible under traditional or statutory rules of evidence, it was not rendered inadmissible under Article 21, regardless of what it contained.

At this point, with *Pointer v. Texas, supra,* the State and Federal rights coalesce, and it is necessary, therefore, to trace the development of the Sixth Amendment provision.

In *Mattox v. United States,* 156 U. S. 237 (1895), one of the earliest cases involving the federal right of confrontation, the Court stated (p. 242):

> "The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

Mattox had been convicted of murder in an earlier trial, but the conviction had been reversed on appeal. In the interval before his retrial, two material witnesses had died, and the question was whether a transcript of the reporter's notes of

---

17. *Jones* was also cited in Purks v. State, 226 Md. 43 (1961), and McCloskey v. Director, 230 Md. 635 (1963). Both of those were civil proceedings under the former defective delinquency law and involved the admissibility of a report from Patuxent Institution. In neither case was the admission of the report objected to on confrontation grounds.

their earlier testimony was admissible at the second trial. The Court held that it was admissible, noting, on the one hand, that "the right of cross-examination once having been exercised, it was no hardship upon the defendant to allow the testimony of the deceased witness to be read", and that to read the constitution in so technical a manner as to produce a different result would be to carry the right "farther than is necessary to the just protection of the accused, and farther than the safety of the public will warrant."

The simple point in *Mattox* is that, where a witness has once given testimony under oath, in the presence of the accused, subject to cross-examination, and that witness is unavailable to be present at trial, his recorded testimony is admissible. The right of confrontation, though applicable, *has been satisfied.* This is entirely consistent with what Hawkins, Chitty, and Hale believed the common law rule and practice to be (*see* footnote 6) and has been adopted on a number of occasions since *Mattox* by the Maryland Court of Appeals.[18]

A different principle is applicable, at least under federal standards, when a document other than prior recorded testimony is involved. The Supreme Court first dealt with this issue in *Kirby v. United States,* 174 U. S. 47 (1899). The defendant there was convicted of receiving stolen goods. A necessary element of that crime was proof that the goods in question had been stolen from the United States government. This element was sought to be proved by offering a record of the conviction of the person who allegedly stole the goods, under a federal statute making the thief's conviction conclusive evidence against the alleged receiver that U. S. property was stolen. The Court held the statute unconstitutional, declaring that, constitutionally, the

---

18. *See, for example,* Contee v. State, 229 Md. 486, 491 (1962), *cert. denied* 374 U. S. 841 (1963): "It is well settled that testimony taken at a former trial may be admitted, if it be shown that the witness is dead, insane, or beyond the jurisdiction of the court, or on diligent inquiry cannot be located, or that some other circumstance exists which shows that the witness who gave the testimony at the former trial cannot be procured as a witness at the second trial.... The writers and authorities all agree that where there was an opportunity to cross-examine the witness in the former trial, there is no violation of the right to be confronted with the witnesses against the accused...."

document — the record of conviction — could not suffice to establish a fact required to be proved by witnesses.[19]

A further strengthening of the federal right came in *Motes v. United States.* 178 U. S. 458 (1900). There, the Court concluded that the transcript of testimony of a government witness, given at a preliminary hearing at which cross-examination was allowed, was not admissible at trial where the witness had absconded as a result of the government's negligence. At page 474, the Court stated:

> "We are unwilling to hold it to be consistent with the constitutional requirement that an accused shall be confronted with the witnesses against him, to permit the deposition or statement of an absent witness taken at an examining trial to be read at the final trial, when it does not appear that the witness was absent by the suggestion, connivance, or procurement of the accused, but does appear that his absence was due to the negligence of the prosecution. We need not decide more in the present case."

In *Dowdell v. United States,* 221 U. S. 325 (1911), the Court considered a statutory codification of the Sixth Amendment right, as it appeared in the Philippine Bill of Rights. On the defendant's initial appeal to the Philippine Supreme Court, a question arose as to whether he had ever entered a plea to the charge, and whether he had been present, as required, throughout his trial. The record was unclear as to the latter question, and, in order to clarify it, the territorial Supreme

---

**19.** *See,* at 174 U. S. 55: "But a fact which can be primarily established only by witnesses cannot be proved against an accused — charged with a different offense for which he may be convicted without reference to the principal offender — except by witnesses who confront him at the trial, upon whom he can look while being tried, whom he is entitled to cross-examine, and whose testimony he may impeach in every mode authorized by the established rules governing the trial or conduct of criminal cases." To conclude that the Legislature could provide otherwise, said the Court, would be to concede its power "to impair the very substance of a right long deemed so essential for the due protection of life and liberty that it is guarded against legislative and judicial action by provisions in the Constitution of the United States and in the Constitutions of most, if not all, the states composing the Union."

Court directed the trial court clerk to certify (1) whether he, the clerk, was present throughout the trial, and (2) whether, from his own observation, the defendant was also continuously present. The United States Supreme Court upheld this procedure against attack on confrontation grounds, stating:

"This provision of the statute [right of confrontation] intends to secure the accused in the right to be tried, so far as facts provable by witnesses are concerned, by only such witnesses as meet him face to face at the trial, who give their testimony in his presence, and give to the accused an opportunity of cross-examination. It was intended to prevent the conviction of the accused upon depositions or *ex parte* affidavits, and particularly to preserve the right of the accused to test the recollection of the witness in the exercise of the right of cross-examination."

The Court went on to say, however, (p. 330):

"But this general rule of law embodied in the Constitution . . . and intended to secure the right of the accused to meet the witnesses face to face, and to thus sift the testimony produced against him, has always had certain well-recognized exceptions. As examples are cases where the notes of testimony of deceased witness, of which the accused has had the right of cross-examination in a former trial, have been admitted. Dying declarations, although not made in the presence of the accused, are uniformly recognized as competent testimony. Mattox v. United States, supra. *Documentary evidence to establish collateral facts* admissible under the common law, may be admitted in evidence." (Emphasis supplied.)

The Court did not explain what it meant by the qualifying phrase "to establish collateral facts"; but it does seem clear

that it was not excepting *all* documentary evidence from the strictures of the confrontation clause.[20]

Some additional doubt about the status of documentary evidence arose from the Court's Opinion in *Snyder v. Massachusetts,* 291 U. S. 97 (1934), a case that involved neither documents nor the right of confrontation. Massachusetts law permitted a jury to view the scene of the alleged crime, and the sole question before the Court was whether Snyder's Fourteenth Amendment right to due process of law (rather than his Sixth Amendment right to confrontation) was violated because he was not present when the jury was taken to the scene and made its view. In affirming the conviction, the Court attempted to draw a distinction between the "privilege of presence" and the "privilege of confrontation", and, with citations omitted, said of the latter, at page 107:

> "Nor has the privilege of confrontation at any time been without recognized exceptions, as for instance dying declarations or documentary evidence.... The exceptions are not even static, but may be enlarged

---

20. The Supreme Court cited People v. Jones, 24 Mich. 215 (1873) as authority for its statement concerning documentary evidence. That case gives a good insight into the function, and the limits, of the right of confrontation. The defendant was charged with attempting to set fire to a clothing store with intent to injure the Putnam Fire Insurance Co., the insurer of the store. A required element for conviction was proof that Putnam was authorized to do business in the State, which the prosecutor offered to show by means of a certificate from the Secretary of State. Against a "confrontation" objection, the court stated, at p. 225:

"We do not think the provision of the [Michigan] constitution securing to the defendant in a criminal prosecution the right 'to be confronted with the witnesses against him' can apply to the proof of facts in their nature essentially and purely documentary, and which can only be proved by the original, or by a copy officially authenticated in some way, especially when the fact to be proved comes up collaterally, as in the present case. In such a case, it would, in fact, be impossible to apply it, except by requiring the attendance and testimony of the secretary of state, to the fact of the filing of the papers, etc., to which he has certified."

To similar effect, *see* United States v. Benner, 1 Baldw. 234; United States v. Liddle, 2 Wash. C.C.R. 205; United States v. Ortega, 4 Wash. C.C.R. 531. Read in the light of these precedents, the exception for documentary evidence approved by the Supreme Court in Dowdell would appear to be much narrower than the bare language used might suggest.

from time to time, *if there is no material departure from the reason of the general rule.*" (Emphasis supplied.) [21]

The Court made clear what it viewed as the "reason of the general rule" in *Pointer v. Texas,* 380 U. S. 400, as it declared the essence of this "fundamental right" of confrontation to be the right of cross-examination, made effective by the assistance of counsel. *See* pp. 405-407. Recognizing the admissibility of dying declarations, testimony of a deceased witness who testified at a former trial, and "other analogous situations which might not fall within the scope of the constitutional rule requiring confrontation of witnesses", the Court nevertheless concluded that "a major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him." This "fundamental right" which, in that case, was incorporated into the due process clause of the Fourteenth Amendment and thus made obligatory upon the States, the Court held was violated when a transcript of testimony given at a preliminary hearing, at which the defendant was present but without counsel, was admitted into evidence without the witness being present at trial. The Court's holding may be summarized in this part of its statement at p. 407:

"Because the transcript of [the witness'] statement offered against petitioner at his trial had not been taken at a time and under circumstances affording petitioner through counsel an adequate opportunity to cross-examine [the witness], its introduction ... in a criminal case ... amounted to denial of the privilege of confrontation guaranteed by the Sixth Amendment."

Re-affirmation of this concept of the right of confrontation — that of preserving and ensuring the right of

---

**21.** *See, however,* Illinois v. Allen, 397 U. S. 337 (1970), where this "privilege" of presence was held to be a "right to be present" at "every stage of the trial" that was included within the right of confrontation (a right, nevertheless, that could be waived).

cross-examination — came in *Douglas v. Alabama,* 380 U. S. 415 (1965) and again in *Bruton v. United States,* 391 U. S. 123 (1968), both cases involving the admissibility of confessions by an accomplice who, by virtue of the Fifth Amendment, was not subject to cross-examination.[22] It came again, even more pointedly in *Barber v. Page,* 390 U. S. 719 (1968), dealing again with the use of a transcript of testimony given at a preliminary hearing. *Pointer,* as noted, rendered such a transcript inadmissible if the witness whose testimony it recorded had not been subject to cross-examination. In *Barber,* the Court, extending perhaps the rationale of *Motes, supra,* concluded that, even if the former testimony was given subject to cross-examination, the transcript is still inadmissible unless the witness is truly unavailable for trial, and that his incarceration in a federal prison outside of the State's jurisdiction did not render him constitutionally unavailable. Pointing out the different ways in which the State could have obtained the witness for trial, the Court said, at page 724:

> "In short, a witness is not 'unavailable' for purposes of the foregoing exceptions to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial. The State made no such effort here, and, so far as this record reveals, the sole reason why Woods was not present to testify in person was because the State did not attempt to seek his presence. The right of confrontation may not be dispensed with so lightly."

The right to confrontation, the Court held, "is basically a trial right" that includes "both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness." Thus, "[w]hile there may be some

---

**22.** In *Bruton,* the Court noted in footnote 3, at page 128: "There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned, and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." So important was the confrontation right applied in *Bruton* that the *Bruton* holding was applied *retroactively* to the States. *See* Roberts v. Russell, 392 U. S. 293 (1968).

justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demands of the confrontation clause where the witness is shown to be actually unavailable," that justification does not pertain where the witness can be produced in court.

Since *Pointer,* the Supreme Court has never retreated from what is essentially a two-step view of the confrontation clause: (1) that its principal mission is to ensure a fair trial by safe-guarding the right of effective cross-examination of witnesses; and (2) this is a mission that can be accomplished only by requiring witnesses giving critical evidence to be in court where they may be cross-examined in the presence of the accused and the trier of fact. The cases following *Barber* and *Bruton* only reinforce that interpretation.

*California v. Green,* 399 U. S. 149 (1970), marked the first occasion in which the Court squarely addressed, in a broad way, the interrelationships between the right of confrontation and the hearsay rule. At issue was the extent to which the prior inconsistent statement of a witness *testifying at trial* was admissible into evidence. Noting that, in terms of the law of evidence, there were two points of view about this — the majority view allowing such statements only for the purpose of impeachment, and not for their truth, the minority view permitting such statements to be received for their truth — the Court addressed what it deemed to be the narrow issue of whether the right of confrontation is "necessarily inconsistent with a State's decision to change its hearsay rule to reflect the minority view described above."

In this context, the Court concluded that the confrontation clause does not represent a "constitutionalization" of the hearsay rule and its common law exceptions, and thus does not preclude States from modifying that rule or creating new exceptions to it.[23] The Court warned, however, (p. 156) that:

> "Given the similarity of the values protected, however, the modification of a State's hearsay rules to create new exceptions for the admission of evidence against a defendant, will often raise

---

23. *See also* Dutton v. Evans, 400 U. S. 74 (1970).

questions of compatibility with the defendant's constitutional right to confrontation. Such questions require attention to the reasons for, and the basic scope of, the protections offered by the Confrontation Clause."

Here, the Court considered the confrontation clause as involving more than just the right of cross-examination, but as having a triple function. It "(1) insures that the witness will give his statements under oath — thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." [24] (p. 158) Each of these objectives is satisfied when the witness testifies at trial. Thus, said the Court, "there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, *as long as the declarant is testifying as a witness and subject to full and effective cross-examination.*" 399 U. S. at 158. (Emphasis supplied.)

Warning, a second time, of the danger of admitting out-of-court declarations where the witness is *not* present in court, the Court stated, at page 161:

"Finally, we note that none of our decisions interpreting the Confrontation Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial. The concern of most of our cases has been focused on precisely the opposite situation — situations where statements have been admitted in the absence of the declarant and without any chance to cross-examine him at trial. These situations have arisen through application of a number of traditional 'exceptions' to

---

24. *Compare, however,* Davis v. Alaska, 415 U. S. 308 (1974), where the Court viewed the confrontation clause in the context of the paramount importance of the opportunity for cross-examination.

the hearsay rule, which permit the introduction of evidence despite the absence of the declarant usually on the theory that the evidence possesses other indicia of 'reliability' and is incapable of being admitted, despite good-faith efforts of the State, in any way that will secure confrontation with the declarant. Such exceptions, dispensing altogether with the literal right to 'confrontation' and cross-examination, have been subjected on several occasions to careful scrutiny by this Court."

This cautionary approach has since been echoed by the Maryland Court of Appeals. In *State v. Collins,* 265 Md. 70 (1972), the Court held that a deposition of a State's witness who died prior to trial was inadmissible because the defendant had been unaware of, and therefore not present at, the taking of the deposition. In reaching this conclusion, apparently under both the State and the Federal constitutional provisions, the Court stated (p. 76) that:

"The prerogative of the defendant to have his accusers confront him is a keystone to our concept of criminal justice — grounded on the unwavering belief that an individual should be afforded the opportunity to challenge the witnesses against him through cross-examination."

Reflecting back upon *Jones v. State, supra,* and its description of the "limited exceptions to the confrontation requirement", the Court noted (p. 78):

"But these aberrations have only been permitted after close scrutiny has disclosed that this type of evidence is *both necessary and so intrinsically reliable that it need not be subjected to the rigors of cross-examination.*" (Emphasis supplied.)

*See also Crawford v. State, supra,* 282 Md. 210, where the Court, following *Mancusi v. Stubbs,* 408 U. S. 204 (1972), applied an "indicia of reliability" test in determining whether the prior recorded testimony of an absent witness was admissible at trial.

Notwithstanding what appears to be a rather evident trend by both the Supreme Court and the Court of Appeals, at least since *Pointer v. Texas,* toward applying the requirements of the confrontation clause in a more meaningful way, and, conversely, in placing limits on the exceptions to it, this Court, in *Jackson v. State, supra,* 31 Md. App. 332, stated, at p. 343:

> "We conclude that a State court may, in a criminal trial, under appropriate circumstances, constitutionally dispense altogether with the literal right to confrontation and cross-examination. One might view the confrontation clause and the hearsay exceptions as represented by circles, not quite concentric, but sharing a substantial area covered by both. When a question arises in the area covered by both, either rule alone provides sufficient protection to the rights of the accused."

We need not, and do not, retreat from the actual holding in *Jackson* — that hearsay testimony of an "excited utterance" may be admissible in a criminal case. However, it does appear that such a broad statement, purporting to authorize a court to dispense altogether with the constitutional right of confrontation, and declaring, in effect, the confrontation clause to be no bar to the admission of any evidence otherwise admissible under some exception to the hearsay rule, is inconsistent with the controlling pronouncements of the Supreme Court, the Court of Appeals, and the federal appellate courts.[2] We can no longer endorse such a conclusion.

---

**25.** *See,* in particular, the statement in California v. Green, 399 U. S. at 155: "Our decisions have never established such a congruence [between the right of confrontation and the hearsay rule]; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception." *See also* United States v. Oates, 560 F. 2d 45, 80 (2nd Cir., 1977): "Whatever the law on this point may have once been, there can no longer be any doubt that, despite the fact that an extra-judicial statement may satisfy the requirements of a recognized exception to the hearsay rule, the introduction of such a statement may in certain circumstances be barred because that introduction, if accomplished, would violate the defendant's right to confrontation." *In accord, see* United States v. Lipscomb, 435 F. 2d 795 (5th Cir., 1970), *cert. denied* 401 U. S. 980, *reh. denied,* 402 U. S. 966. *See also* State v. LaRochelle, 297 A. 2d 223 (N.H., 1972), *but compare* Henson v. State, 332 A. 2d 773 (Del., 1975).

Having traced through the development of the constitutional provisions, and the progression of their judicial construction, it becomes clear that the reception into evidence of the medical staff conference summary, containing the opinions of Drs. Silver, Fitzpatrick, and Abbas, as part of the entire hospital record from Perkins, violated appellant's right to be confronted with those three witnesses. It was therefore reversible error.

In reaching this conclusion, we need not consider the ultimate extent to which the right of confrontation applies to documents, as opposed to testimony; for, as the cases make clear, all documents are not alike. A transcript of prior recorded testimony is a document, and, if properly authenticated, is admissible under one or more recognized exceptions to the hearsay rule; but it is not necessarily admissible under the confrontation clause. So it is with a hospital record. The mere fact that a document is part of a hospital record made in the ordinary course of the hospital's business, and may therefore be admissible under the hearsay rule, does not *ipso facto* make its admission comply with the confrontation requirement.

Under what we perceive to be the prevailing, and correct, view, we must look more closely at the disputed document itself. What evidence is contained in it? For what purpose is it offered? Does the statement in it relate directly and critically to the defendant's guilt or innocence, or does it pertain to collateral issues? Is the document primarily testimonial, or is it merely the recordation of a fact as easily and reliably proved by the document itself as by live testimony? If testimonial in nature, why is the author of the statements contained in it not in court? Is the information contained in it of a type that one may reasonably suppose its mere recordation in the ordinary course of business lends a sufficient reliability to it to be acceptable as trustworthy evidence? These, it would appear, are the relevant considerations.[26]

---

**26.** In State v. Henderson, 554 S.W.2d 117 (Tenn., 1977), a tripartite test was fashioned. There, the Court concluded (at pp. 119-20) that at least three criteria must be met in order to satisfy federal constitutional confrontation

We have here not the routine record of a person's birth, or death, or body temperature, nor any other similar statement of fact or condition objectively ascertained, generally reliable and normally undisputed, and free from any motive to record falsely. We are dealing with the opinions of supposed expert witnesses, who, in this document, are giving testimony not only as to appellant's mental condition, but, more importantly, as to whether or not he is criminally responsible. The document was offered without limitation as to purpose, and therefore for its truth. Thus, the jury was not merely advised of the fact that three staff psychiatrists had formed certain opinions; it was asked to accept as true — *i.e.,* to believe — the opinion of these three physicians that appellant was "sane" at the time he entered the bank.

This is critical evidence of a testimonial nature, pertaining directly to appellant's ultimate "guilt", that could, and should, have come *viva voce* — from the mouths of the witnesses in court, where, under the watchful eye of the jury, they could be cross-examined in the same manner as those physicians who did testify. There is nothing in the record to show that any of these three doctors were unavailable to appear in court; and we must assume that they did not appear simply because they were not summoned.

Psychiatry — particularly the forensic branch of it — is an inexact science. *See New York Life Ins. Co. v. Taylor,* 147 F. 2d 297, 304 (D.C. Cir., 1945), opinion on rehearing. One need do no more than peruse the reported appellate opinions touching upon the issue of a criminal defendant's "sanity" to see the frequency with which well-qualified and presumably competent practitioners express different — and sometimes widely varying — opinions concerning that critical issue. Considering the less-than-certain and ever shifting state of the art, these opinions, given their ultimate potential effect, cry out for cross-examination. We can find no basis whatever

rights: (1) By implication the evidence must not be "crucial" or "devastating"; (2) the State must make a good faith effort to secure the presence of the person whose statement is being offered against the defendant; (3) the evidence offered under a hearsay exception must bear its own "indicia of reliability". We perceive this to be more a difference in phraseology than in substance.

upon which to imbue out-of-court opinions as to criminal responsibility with the requisite degree of trustworthiness — the indicia of reliability — merely because they were recorded in the normal course of business. The routineness of the reporting may (and in Maryland does) suffice by statute to exempt the document from the hearsay rule, but that does not withdraw it from the ambit of the confrontation requirement. *See Phillips v. Neil,* 452 F. 2d 337 (6th Cir., 1971), *cert. denied* 409 U. S. 884. Drs. Silver, Fitzpatrick, and Abbas were truly witnesses against appellant, as much so as Drs. LeBow and Hertzberg; and appellant had a right to be confronted with them.

To conclude otherwise would permit the State to have offered the opinions of all five psychiatrists merely by offering the hospital record authenticated by its custodian, without the benefit of any live testimony. Whether it involves three witnesses or five, such a procedure would violate every asserted purpose for the constitutional provision. It would permit a trial upon even less than *ex parte* affidavit — but upon an *unsworn* out-of-court statement; it would deny the right and opportunity to cross-examine; it would eliminate any practical ability on the part of the jury to judge for itself, in part as a result of cross-examination, the demeanor, the knowledge, the bias, and, in general, the credibility of the witness and the validity of his testimony; and it would encourage prosecutors to present less than the best and most authentic evidence that is available, especially when the witness may be a weak or doubtful one.[27] In short, it is

---

27. *See* Comment, 75 Yale L.J. 1434, 1438 (1965-66): "[The confrontation clause] should focus on the legitimate concerns raised by a liberalized hearsay rule: that such a rule may institutionalize baseless prosecutions, or at least tempt prosecutors to use hearsay instead of live witnesses whose demeanor is unimpressive; or that it may induce prosecutorial negligence in securing witnesses by holding out the easy alternative of presenting their statements through other witnesses. Such practices undermine any system of criminal justice that presumes innocence and insists that the process of rebutting the presumption be absolutely above reproach. . . . *The objection to the prosecutor's presentation of hearsay instead of an available witness is not that such hearsay necessarily is less reliable than the hearsay of an unavailable witness, but that the prosecutor has made the testimony less reliable than it might have been.*" (Emphasis supplied.) *See also* Stewart v. Cowan, 528 F.2d at 84 (6th Cir., 1976).

difficult to imagine anything more that the confrontation requirement was designed to prevent than what occurred here.[28]

In general accord with this view, see *Kienlen v. United States,* 437 F.2d 843 (10th Cir., 1971), *Phillips v. Neil, supra,* 452 F.2d 337; *Stewart v. Cowan,* 528 F.2d 79 (6th Cir., 1976); *United States v. Oates, supra,* 560 F.2d 45; *People v. Johnson,* 296 N.E.2d 763 (Ill.App., 1973); *Bennett v. State,* 448 P.2d 253 (Okl.Cr., 1968); *compare United States v. Davila-Nater,* 474 F.2d 270 (5th Cir., 1973).

For these reasons, as noted, we believe the admission of that part of the hospital record containing the opinions of Drs. Silver, Fitzpatrick, and Abbas to have been erroneous, requiring that the judgments of the trial court be reversed.

## (2) *Questioning Lay Witnesses as to Mental Condition*

Defense counsel sought, unsuccessfully, to question the various bank employees who testified for the State about their perception and opinion as to appellant's rationality at the time of the incident. In light of our conclusion with respect to confrontation, it is unnecessary in this appeal to address that issue; however, for the guidance of the trial court upon remand, we shall do so.

It is clear that lay witnesses are incompetent to render an opinion as to a defendant's "sanity". Such an opinion may be rendered only by a "medically trained psychiatrist", or, since July 1, 1978, by a certified psychologist. *See Saul v. State,* 6 Md. App. 540 (1969), *aff'd* 258 Md. 100; *Bremer v. State,* 18 Md. App. 291, 317, 318 (footnote 9) (1973), *cert. denied* 415 U. S. 930; Laws of Md., 1978, ch. 481. To the extent that the opinions sought to be elicited from these lay witnesses were intended to bear upon the issue of appellant's responsibility — *i.e.,* sanity — the witnesses were not competent to give

---

28. For the reasons stated in Phillips v. Neil, *supra,* 452 F. 2d at 348, it is no answer to say that appellant was aware of the opinions of the three absent doctors and could have called them as his witnesses for purposes of cross-examination. It was the State's burden — not that of appellant — to produce the witnesses against him.

them. To the extent that the desired opinions did not bear on that question, but concerned appellant's general "rationality" or lack thereof, they would have been irrelevant, at best, and, at worst, confusing to the jury. Evidence of some undefined mental disorder or instability would have been insufficient proof to overcome the presumption of sanity, even if the jury believed it. *Bradford v. State*, 234 Md. 505 (1964); *Greenleaf v. State*, 7 Md. App. 575 (1969). The court's refusal to permit such testimony was therefore entirely correct.

> *Judgments reversed; case remanded to Circuit Court for Montgomery County for new trial; Montgomery County to pay the costs.*