**Raymond L. STEWART,
Petitioner-Appellant,**

v.

**Henry COWAN, Warden,
Respondent-Appellee.**

No. 74–1581.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 16, 1974.

Decided Jan. 7, 1976.

---

Joseph G. Glass, Louisville, Ky., for petitioner-appellant.

Ed W. Hancock, Atty. Gen. of Ky., Robert L. Chenoweth, Asst. Atty. Gen., Frankfort, Ky., for respondent-appellee.

Before WEICK, McCREE and ENGEL, Circuit Judges.

McCREE, Circuit Judge.

This is an appeal from the denial by the district court of appellant's petition for a writ of habeas corpus challenging his confinement following a Kentucky state court conviction of wilful murder. We consider whether the Confrontation Clause of the Sixth Amendment[1] precludes: (1) the admission of hearsay testimony by a local police officer about the result of a ballistics test conducted by an FBI laboratory technician who was not produced as a witness, and (2) the admission of hearsay testimony by the same officer that he had received several phone calls from anonymous persons accusing appellant of the crime. We hold that because the ballistics testimony constituted a significant link in the chain of circumstantial evidence against appellant, and because the prosecution failed to justify the unavailability of the per-

---

1. "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." Amend. VI, U.S. Const.

son who prepared the ballistics report, the Confrontation Clause of the Sixth Amendment was violated when a police officer who had no personal knowledge of the ballistics test was permitted to tell the jury about its results. With respect to the second issue, we hold that the admission of the police officer's testimony that he had received several telephone calls from anonymous persons who accused appellant of shooting the victim also violated the Confrontation Clause.

Because we must assess the impact of the challenged testimony in the context of the other evidence against appellant, we set forth the factual circumstances in somewhat greater than usual detail.

Before murder charges were filed against appellant, he was facing prosecution for the theft of several thousand dollars worth of clothing from the Captain's Closet, a clothing store in Louisville, Kentucky. The theft took place in October 1968 and the homicide of which appellant was convicted occurred in the afternoon of January 21, 1969. The victim was Robert A. Benberry, who would have been a principal witness against Stewart in the trial for the theft of the clothing.

It appears that an owner of the Captain's Closet heard that Stewart was selling clothing similar to the type that was stolen, and asked Benberry and a companion, Ealy, to attempt to purchase a coat from appellant. Stewart sold them a coat from a supply of clothing in the trunk of his car. When the owner of the store identified the coat from his invoice and from the price tag affixed to it, charges were promptly filed against Stewart for burglary.

With respect to the facts surrounding the shooting, the record indicates that Benberry and Ealy met at a restaurant to celebrate Ealy's birthday. The two men drank some portion of a bottle of bourbon whiskey at the restaurant and then departed for a drive around the city. While driving, Ealy saw a friend entering the Top Hat Cafe, and suggested stopping there so that he could have a word with him. At the murder trial, Ealy testified that after he hurriedly got out of the car, he observed Benberry, still in the parked car, talking to "a couple of guys." Ealy heard a shot shortly after he entered the cafe, and he was informed that his friend had been shot. Ealy testified that he did not see the shooting. He left the cafe and found Benberry lying in the street. Although there was a crowd of about thirty people in the vicinity, Ealy said he noticed a man walk away from the scene and turn a corner. At a police lineup, Ealy could not identify appellant as the man who walked away.

The prosecutor's theory in the murder trial was that appellant killed Benberry in order to prevent him from testifying before the grand jury and at the trial on the charges of storehouse breaking. Nearly all of the evidence presented at the trial by the prosecution was given by police officers who had no personal knowledge of the circumstances of the killing.

Officer Green testified that he was one of the officers dispatched to the scene of the shooting. He stated that he found Benberry lying in the street and, that with the assistance of another officer, he drove him to General Hospital.

Officer Reece of the Homicide Squad testified that he found one spent cartridge casing from a .25 caliber automatic at the scene on the day of the shooting, and that on the next day he found three .22 caliber casings there. Detective Mercer, also of the Homicide Squad, testified that he had interviewed most of the 30–35 people present at the scene of the shooting, but that he was "unable to get any information out of any of the bystanders." Mercer also testified, over objection, that a ballistics report from the FBI laboratory indicated that although the bullet found in Benberry's body had markings similar to those that would have been produced by the putative murder weapon, there were "insufficient microscopic marks remaining" on the bullet for comparison or identification purposes. Mercer also testified over

objection that he received at least five anonymous phone calls implicating Stewart as the murderer. Finally, Mercer was permitted to testify from a police department file about a lineup at which he had not been present.

William Bryant was called as a witness by the prosecutor to establish that the gun analyzed in the ballistics report had been in appellant's possession. Bryant testified that he had been arrested for carrying a concealed weapon and that Raymond Stewart had given him the gun. However, on cross-examination the witness testified that "if that's Raymond Stewart over there [pointing to the appellant], he didn't give me the pistol."

The last prosecution witness called by the State, and the only one who was able positively to identify appellant as having been in the vicinity of the crime, was Luther Geter. Geter, an elderly man, said that he did not see who shot Benberry, but that he saw Stewart walking away from the scene of the shooting on the other side of the street. Geter also said that he saw a dark gun in Stewart's right hand. On cross-examination he conceded that the murder weapon exhibited at trial was bright rather than dark, and the gun he observed in Stewart's hand "didn't shine that bright from where I was standin'."

Appellant testified on his own behalf and admitted his presence at the scene of the shooting but denied that he shot Benberry. He testified that another person whom he had described to the police had shot Benberry.

This review of the evidence demonstrates that the State's case against Stewart was highly circumstantial. No eyewitness was produced to testify that Stewart shot Benberry. However, a police officer was permitted to testify that "as a result of our investigation we learned that everybody in the neighborhood [of the crime] was saying that Raymond Stewart had shot Robert Benberry." In addition, the officer communicated to the court the results of an FBI laboratory report indicating that the putative murder weapon might have fired the fatal bullet.

▪▪▪ We consider first the officer's testimony about the FBI ballistics report. At the outset, the State contends that even if it were a violation of the Confrontation Clause to permit a witness to testify from a ballistics report despite the fact that he had no knowledge of the ballistics investigation, the error was harmless because the results of the tests were favorable to appellant. Although both the Kentucky Court of Appeals (in an unpublished opinion) and the district court expressed the opinion that the content of the report was beneficial to Stewart, we hold that prejudicial error was committed. The following is the police officer's testimony concerning the ballistics report:

Q. Now, referring to the FBI report – – –

MR. TUCKER: I object to reference to the FBI report – – –

BY THE COURT: I've already ruled on the FBI report. Overruled. You may proceed.

MR. TUCKER: Judge, for the record, I'm objecting to the mention of the FBI report on the basis that the defendant is denied the right to confront the witness.

BY THE COURT: Overruled.

Q. by Mr. Wooldridge: (continuing) Now, referring to the FBI report, was this bullet that was removed from Mr. Benberry's body sent also to the FBI laboratory?

A. Yes, sir, it was.

Q. First of all, will you tell the jury what caliber bullet that is?

A. It's a .22-caliber bullet, sir.

Q. And will you tell the jury what caliber bullet this gun [referring to purported murder weapon] shoots?

A. It shoots a .22-caliber either long, short or long rifle.

Q. Now then, was the FBI laboratory technician able to say that that bullet came from that gun?

A. No, sir, he wasn't.

Q. All right. Would you read to the jury the best he could do, based on what he had?

A. The bullet which came from Benberry's body is referred to in this report as Specimen Q5. The revolver is referred to as Specimen K1. Specimen Q5, or the bullet, is a partially mutilated caliber .22 long rifle hollow point, brass coated, lead bullet of Remington-Peters manufacture which was fired from a barrel rifled with six lands and grooves, right twist. While the four barrels of K1, K1 is the revolver which I hold in my hand, *while the four barrels of K1 produce rifling impressions like those on Q5*, there are insufficient microscopic marks remaining on Q5 for comparison or identification purposes. [Emphasis added.]

We believe that the officer's testimony cannot fairly be characterized as "beneficial" to Stewart. If the test had shown that the purported murder weapon definitely had *not* been used to fire the fatal bullet, it would be accurate to say that this testimony was beneficial to appellant. Here, however, the officer's recital of the report indicated that the bullet was fired by a gun similar to the one alleged to be the murder weapon, but that there were insufficient microscopic marks remaining on the bullet for identification purposes. This statement served as another important link in a chain of circumstantial evidence against appellant. As the prosecutor's closing argument indicates, he wanted the jury to believe that it was *possible* that the fatal bullet came from the purported murder weapon.

Since the introduction of this testimony was prejudicial, we must determine whether the error violated the Constitution. We begin with a brief examination of the history of the adoption of the Confrontation Clause of the Sixth Amendment. As Justice Harlan observed, "From the scant information available it may tentatively be concluded that the Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous accusers, and absentee witnesses." *California v. Green*, 399 U.S. 149, 179, 90 S.Ct. 1930, 1946, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring).[2]

An English legal historian has described the nature of the old English proceedings that gave rise to the demands for confrontation by accusers:

> [The prosecuting attorneys] would frequently allege matters which the prisoner denied and called upon them to prove. The proof was usually given by reading depositions, confessions of accomplices, letters, and the like; and this occasioned frequent demands by the prisoner to have his 'accusers', i. e., the witnesses against him, brought before him face to face. 1 *J. Stephen, A History of the Criminal Law of England* 326 (1883).

This paragraph implies that the Confrontation Clause was adopted to outlaw the employment of letters, affidavits, and other second-hand accounts by the prosecution when the actual accusing witnesses were available. *See* Baker, *Right to Confrontation, the Hearsay Rules and Due Process—a Proposal for Determining when Hearsay May be Used in Criminal Trials*, 6 Connecticut L.Rev. 529, 532 n. 16 (1974).

In *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), the Supreme Court held that the Confrontation Clause forbade the introduction into evidence of the transcript of testimony taken at a preliminary hearing in the same case. Petitioner in *Barber* sought federal habeas relief, claiming deprivation of his Sixth Amendment right to be confronted with the witness against him at his trial for armed robbery. The principal evidence against him at trial was the reading to the jury of a transcript of

---

**2.** The majority, concurring and dissenting opinions in *Green* all agree that the minimum core of the Confrontation Clause proscribes trial by *ex parte* affidavit. 399 U.S. at 156, *id.* at 179 (Harlan, J., concurring), *id.* at 192, 90 S.Ct. 1930 (Brennan, J., dissenting).

testimony given at a preliminary hearing. Petitioner's attorney, although present at the preliminary hearing, did not cross-examine the witness who was a co-defendant with petitioner but who had waived his privilege against self-incrimination during the course of the hearing. At the time of trial, the witness who had testified at the preliminary hearing was incarcerated in a federal prison in Texas, approximately 225 miles from the trial court. The Supreme Court reversed the Tenth Circuit's denial of the habeas petition on the ground that the prosecution had made absolutely no effort to obtain the presence at trial of the witness who had given testimony in the preliminary hearing. Justice Marshall, writing for the Court, observed that "[t]he primary object of the [Confrontation Clause] . . . was to prevent depositions or *ex parte* affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness . . . ." 390 U.S. at 721, 88 S.Ct. at 1320, *quoting Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895).

We believe that *Barber v. Page* stands for the proposition that the Constitution imposes on the prosecution the burden of showing the unavailability of a witness before it may seek to introduce less reliable accounts of his statements in a criminal trial.[3]

As Mr. Justice Rehnquist observed in *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972), unavailability is a "predicate" of the Confrontation Clause which requires the prosecution to produce available declarants whose statements directly bear on the charges against a defendant. In *Mancusi*, the Court held that the state court's determination that the witness was unavailable to appear in a Tennessee state court should not be upset where it was shown that he was a permanent resident of Sweden and was not subject to being subpoenaed under then existing state or federal law.

In *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), Justice Stewart, speaking for a plurality of the Supreme Court, distinguished the holding in *Barber* concerning the necessity of showing the unavailability of a witness by stating:

> In *Barber* the "principal evidence" against the petitioner was a transcript of preliminary hearing testimony admitted by the trial judge under an exception to the hearsay rule that, by its terms, was applicable only if the witness was "unavailable." This hearsay exception "has been explained as arising from necessity . . . ." 390 U.S. at 722, 88 S.Ct. [1318] at 1320, and we decided only that Oklahoma could not invoke that concept to use the preliminary hearing transcript in that case without showing "a good-faith effort" to obtain the witness' presence at the trial. *Id.*, at 725, 88 S.Ct. [1318] at 1322. 400 U.S. at 85, 91 S.Ct. at 218.

---

**3.** In other cases, the Supreme Court has found a Confrontation Clause violation when hearsay evidence was admitted and the State failed to · make any showing that the declarant was unavailable. *Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Motes v. United States*, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900); *Kirby v. United States*, 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed. 890 (1899).

We agree with one commentator's view of the purposes that the Confrontation Clause should serve:

The confrontation clause . . . should focus on the legitimate concerns raised by a liberalized hearsay rule: that such a rule may institutionalize baseless prosecutions, or at least tempt prosecutors to use hearsay instead of live witnesses . . . .; or that it may · induce prosecutorial negligence in securing witnesses by holding out the easy alternative of presenting their statements through other witnesses. Such practices undermine any system of criminal justice that presumes innocence and insists that the process of rebutting the presumption be absolutely above reproach.

Note, Confrontation and the Hearsay Rule, 75 *Yale L.J.* 1434, 1438–39 (1966).

The Court characterized the evidence in *Dutton* as in no sense being "crucial" or "devastating."

In the trial of this case no less than 20 witnesses appeared and testified for the prosecution. Evans' counsel was given full opportunity to cross-examine every one of them. The most important witness, by far, was the eyewitness who described all the details of the triple murder and who was cross-examined at great length. Of the 19 other witnesses, the testimony of but a single one is at issue here. That one witness testified to a brief conversation about Evans he had had with a fellow prisoner in the Atlanta Penitentiary. The witness was vigorously and effectively cross-examined by defense counsel. His testimony, which was of peripheral significance at most, was admitted in evidence under a co-conspirator exception to the hearsay rule long established under state statutory law. The Georgia statute can obviously have many applications consistent with the Confrontation Clause, and we conclude that its application in the circumstances of this case did not violate the Constitution. 400 U.S. at 87–88, 91 S.Ct. at 219, [Footnote omitted.]

In another case where there was substantial direct evidence demonstrating the guilt of a defendant, we would be inclined to view similar ballistics report testimony as noncrucial evidence. However, we cannot say, in this largely circumstantial case, that the introduction of the ballistics report was not a significant factor in the jury's verdict. Therefore, we hold that *Barber* controls, and that the prosecution was required to show that it made a "good faith effort" to obtain the FBI technician's presence at the trial as a predicate to the admission, under an exception to the hearsay rule, of the ballistics report.

 With respect to the testimony of the police officer that he had received several anonymous telephone calls in which the callers had identified appellant as the perpetrator of the crime, we believe a slightly different problem is presented. It was of course necessary for the prosecution to show a "good faith effort" to obtain the accusing witnesses, whether they were FBI laboratory technicians or telephone callers. If the telephone callers had been on the witness stand and subject to cross-examination, a Confrontation Clause issue would not have been presented. However, even if a "good faith [but unsuccessful] effort" to obtain the witnesses had been made, we believe the introduction of the police officer's testimony violated the Confrontation Clause for the more fundamental reason that the statement lacks sufficient indicia of reliability.

The relevant testimony is as follows:

Q. All right. What was the next step in your investigation?

A. Well, we first became suspicious of the defendant when we learned the victim's identity, since I had had occasion to investigate the break-in at the Captain's Closet. In my office that afternoon, I received I would say five anonymous phone calls, people who

- - -

MR. TUCKER: I object to testimony about anonymous phone calls.

MR. WOOLDRIDGE: Mr. Tucker told us in his opening statement this very thing that the officer is attempting to tell.

BY THE COURT: Officer, I don't want you to testify to what someone else told you. I'm going to let you testify what you found out as a result of your investigation but directly not what was told to you. That is hearsay. Tell the jury what you found out as a result of your investigation.

A. (continuing) As a result of our investigation we learned that everybody in the neighborhood of Hancock and Finzer was saying that Raymond Stewart had shot Robert Benberry.

MR. TUCKER: Judge, I'm going to object to that. That's outrageous.

MR. WOOLDRIDGE: That's what his investigation showed.

MR. TUCKER: I object. I object.

BY THE COURT: I'm going to overrule that. The officer states that as a result of his investigation he found out that Raymond Stewart was the party who did the shooting. Is that what you're saying, Officer?

WITNESS: Not exactly. What I said was _ _ _

BY THE COURT: All right, please correct that for the jury.

A. As a result of our investigation, we learned that a number of people in the neighborhood _ _ _

MR. TUCKER: I'm going to object to what a number of people in the neighborhood said.

BY THE COURT: I'm not going to let you tell this jury what those people told you, Officer. You can bring those people in here and let them testify. I will let you testify as to what your investigation revealed to you.

Q. by Mr. Wooldridge: Well, anyway Mr. Stewart became a suspect. Is that all right? What did you do when you came up with the name of Raymond Stewart as a suspect in this killing?

The State contends that this testimony was correctly admitted, pursuant to a Kentucky exception to the hearsay rule, for the purpose of explaining why the criminal investigation was commenced, and the manner in which it was conducted, and that the testimony was not admitted to establish that Stewart had committed the murder. Because of the hearsay exception the State argues that no Confrontation Clause issue exists. Although we question correctness of the applicability of the Kentucky hearsay exception invoked,[4] we believe the following Supreme Court characterization of the type of case in which the right to confrontation would most likely be found to be abridged will show the error in the State's logic:

Finally, we note that none of our decisions interpreting the Confrontation Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial. The concern of most of our cases has been focused on precisely the opposite situation—situations where statements have been admitted in the *absence of the declarant and without any chance to cross-examine him at trial. These situations have arisen through application of a number of traditional "exceptions" to the hearsay rule, which permit the introduction of evidence despite the absence of the declarant usually on the theory that the evidence*

4. The Kentucky case the State relies upon for the proposition that testimony concerning the method of police investigation may be admitted is *Stallard v. Commonwealth,* 432 S.W.2d 401 (Ky.1968). In that case defendant appealed from a conviction of operating a motor vehicle without the owner's consent. The Kentucky Court of Appeals said that none of the testimony objected to by defendant "was introduced to establish the fact that appellant was operating a motor vehicle without the owner's consent. The purpose of the testimony was to establish that the motorcycle had been stolen, that it had been identified, and the manner in which the investigation of the crime was conducted." 432 S.W.2d at 402.

The relevant testimony was not included in the court's opinion, but we do not believe that the statements above provide a sufficient basis for admitting, in this case, testimony going to the very heart of the prosecutor's case—establishing that five people believed that Stewart had killed Benberry. To quote Wigmore, the hearsay rule signifies "a rule rejecting assertions, offered testimonially, which have not been in some way subjected to the test of cross-examination . . . ." 5 *Wigmore, Evidence* § 1362 (1940). [Emphasis deleted.] Here the declarants' statements implicating the appellant as the perpetrator of the crime were never subjected to cross-examination.

We also cannot accept the proposition that the jury considered the testimony about the phone calls only as indicating the reason for the investigation and that they did not consider the testimony as substantive evidence of the appellant's guilt. "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction. . . ." *Bruton v. United States,* 391 U.S. 123, 129, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476 (1968) *quoting Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring).

*possesses other indicia of "reliability" and is incapable of being admitted, despite good-faith efforts of the State, in any way that will secure confrontation with the declarant. Such exceptions, dispensing altogether with the literal right to "confrontation" and cross-examination, have been subjected on several occasions to careful scrutiny by this Court. California v. Green, 399 U.S. at 161, 90 S.Ct. at 1936. [Emphasis added. Footnote omitted.]*

In *Phillips v. Neil,* 452 F.2d 337 (6th Cir. 1971), *cert. denied,* 409 U.S. 884, 93 S.Ct. 96, 34 L.Ed.2d 141 (1972), we held, in an appeal from the denial of a petition for habeas corpus where the appellant was challenging a murder conviction, that the introduction into evidence of medical reports containing suggestions that appellant was responsible for his actions, when the principal defense to the crime was insanity, constituted a violation of appellant's Sixth Amendment confrontation rights even though the records might have been validly admitted as a hearsay exception under Tennessee law. Judge William E. Miller, speaking for the court, said:

[I]n the instant case, where no showing was made of special need to dispense with the appellant's right of confrontation, we find not the "indicia of reliability" discovered in *Evans* but rather factors which indicate a distortion of the "truth-determining process." In *Evans v. Dutton, supra,* the Supreme Court made clear that the mission of the Confrontation Clause is the protection of the integrity of this process. 452 F.2d at 348.

In *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the Court held that the out-of-court declaration of a co-conspirator could be introduced against the defendant without first showing that the co-conspirator was unavailable to testify at trial. One of the twenty witnesses at defendant's murder trial was a man named Shaw. Shaw testified that he and an alleged co-conspirator of Evans were fellow prisoners after Evans and his co-conspirator were arraigned. During direct examination, Shaw related a statement communicated to him by the co-conspirator to the effect that "if it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now." 400 U.S. at 77, 91 S.Ct. at 214.

In determining whether the statement had sufficient indicia of reliability for admission into evidence, Justice Stewart, speaking for a plurality of the Court, said:

The confrontation issue arises because the jury was being invited to infer that Williams had implicitly identified Evans as the perpetrator of the murder when he blamed Evans for his predicament. But we conclude that there was no denial of the right of confrontation as to this question of identity. First, the statement contained no express assertion about past fact, and consequently it carried on its face a warning to the jury against giving the statement undue weight. Second, Williams' personal knowledge of the identity and role of the other participants in the triple murder is abundantly established by Truett's testimony and by Williams' prior conviction. It is inconceivable that cross-examination could have shown that Williams was not in a position to know whether or not Evans was involved in the murder. Third, the possibility that Williams' statement was founded on faulty recollection is remote in the extreme. Fourth, the circumstances under which Williams made the statement were such as to give reason to suppose that Williams did not misrepresent Evans' involvement in the crime. These circumstances go beyond a showing that Williams had no apparent reason to lie to Shaw. His statement was spontaneous, and it was against his penal interest to make it. These are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant. 400 U.S. at 88–89, 91 S.Ct. at 219.

Although we realize that the hearsay rule and the Confrontation Clause are not congruent, we also believe that the two concepts protect similar values and, specifically, are aimed at excluding unreliable testimony. *California v. Green,* 399 U.S. at 161, 90 S.Ct. 1930; *Dutton v. Evans,* 400 U.S. at 88, 91 S.Ct. 210; *Phillips v. Neil,* 452 F.2d at 348.

Our evaluation of the statement made by Mercer that several anonymous persons, in telephone conversations, had implicated appellant as the perpetrator of the crime convinces us that the statement does not contain the indicia of reliability mentioned in *Dutton.* Instead, as in *Phillips,* we find factors which indicate a distortion of the truth-determining process. Comparing the statement from the anonymous witnesses in this case with the one in *Dutton,* we observe, first, that this statement contained an express assertion about a past fact—that Stewart killed Benberry. Second, the identity of the declarants and their personal knowledge that Stewart was the perpetrator of the crime is far from clear. It is entirely possible that the telephone calls were made by persons who had no direct knowledge of the crime and were merely relating neighborhood gossip or rumor. Third, the circumstances under which the anonymous telephone calls were received suggest the possibility of deliberate misrepresentation of Stewart's involvement in the crime. The telephone calls could have been instigated by someone who hoped to place the blame on Stewart, or the calls could even have been fabrications to buttress a weak case against appellant. Because this testimony was highly inculpatory and was not sufficiently reliable, we hold that its admission violated the Confrontation Clause.

Appellant's final assignment of error is that the Confrontation Clause was violated when a police officer was permitted to testify about a lineup that he did not personally observe. The officer testified from the police report that Ealy was unable to identify Stewart as the man walking away from the scene. We do not perceive that this testimony harmed appellant in any way.

The judgment of the district court is reversed and the case is remanded with the direction to enter a judgment granting the writ and discharging appellant from custody unless he is retried within a reasonable time.