**Isaac MILES, Petitioner–Appellant,**

v.

**Roland BURRIS and Richard B. Gramley, Warden, Pontiac Correctional Center, Respondents–Appellees.**

No. 94–2921.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1994.

Decided April 18, 1995.

Rehearing With Suggestion for Rehearing In Banc Denied May 25, 1995.

---

Frederick F. Cohn, Chicago, IL (argued), for Isaac Miles.

Martha E. Gillis, Office of Atty. Gen., Crim. Appeals Div., Chicago, IL (argued), for Roland Burris and Richard B. Gramley.

Before POSNER, Chief Judge, BRIGHT * and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Petitioner Isaac Miles was convicted in an Illinois state court of murdering Bradley Washington. He was sentenced to forty years in prison and is currently incarcerated. Miles appealed, and the Illinois Court of Appeals affirmed his conviction. *People v. Miles*, 176 Ill.App.3d 758, 126 Ill.Dec. 264, 531 N.E.2d 891 (App.Ct.1988). The Illinois Supreme Court refused to hear his case. *People v. Miles*, 125 Ill.2d 571, 130 Ill.Dec. 487, 537 N.E.2d 816 (1989). Miles petitioned for post-conviction relief, but was denied. Over seven years later, Isaac Miles sought a federal writ of habeas corpus as provided by 28 U.S.C. § 2254.

* The Honorable Myron H. Bright of the Eighth Circuit, sitting by designation.

Miles alleges that he was denied his Sixth Amendment right to confront the witnesses against him at trial when a police officer testified for the prosecution that an anonymous informant had tipped the police that Miles committed the murder. Miles also claims that he received constitutionally ineffective assistance of counsel during the trial and direct appeal phases of his case. The district court denied his petition, and Miles now appeals.

## I. Background

The Illinois Court of Appeals' findings state as follows:

At trial, Raymond Washington, no relation to the victim, testified for the State. On December 15, 1985, at approximately 9:45 in the evening, he was walking toward the Dreamweavers Motorcycle Club, which was also a pool hall, on the south side of Chicago. At that time, he saw the victim standing at a phone booth in front of the pool hall "getting ready to dial the telephone" and the defendant standing behind him. Both the victim and defendant were facing Washington at this time. As Raymond Washington walked toward the pool hall, he saw defendant walk behind the victim, pull a gun out of his jacket pocket with his right hand and shoot the victim in the back of the head. Washington was approximately 10 feet away from defendant and the victim at that time. After the shooting, defendant ran through the alley next to the pool hall. When the victim fell, he was holding the phone in one hand and a cigarette in the other. The victim was not armed, had not said anything to defendant and had not made any threatening gestures toward defendant before he was shot. Immediately thereafter, Washington entered the pool hall but did not tell anyone about the shooting. The police arrived approximately five minutes after the shooting but Washington did not tell them what he had seen because he did not want to get involved. He also testified that the lighting was "bright" and that he had gotten a good look at defendant's face. A couple of days after the shooting, Washington told the police what he had seen. He looked through police mug shot books but failed to identify anyone as the shooter. On December 31, Washington identified defendant out of a lineup as the shooter. Washington also testified that he had not made any anonymous phone calls to the police before the 31st. On cross-examination, Washington reiterated that the street lighting where the shooting occurred was bright and that defendant and the victim were approximately 10 feet away from him at the time of the shooting. He also testified that he was able to identify defendant out of the lineup because he "got a good look at his face."

Chicago police officer Raymond Jasten also testified for the State. When he and his partner arrived at the shooting scene the victim was lying with his feet at the base of the telephone booth and was holding a smoking cigarette in his right hand. He also testified that the telephone was hanging off the hook and that there was a fluorescent light over the telephone and "a street light right over the area." Chicago police detective Thomas Brankin corroborated Jasten's testimony regarding the lighting at the crime scene and the fact that the phone was dangling off the hook after the shooting. Detective Brankin also testified that when Raymond Washington viewed the lineup on the 31st, he did not wait until its completion before positively identifying defendant but identified him as soon as he saw him.

Chicago police defective Thomas Ptak testified that while on duty on December 30th, he received an anonymous phone call. The caller told the detective that the man "shot at 69th and Union was shot by a man by the name of Isaac Miles, whose name was—whose nickname was called, Ike." As a result of the phone call, the police arrested defendant the same day.

On his own behalf, defendant testified that he could not actually remember where he was on December 15, 1985. However, he assumed he was at home, 5740 South Lafayette, from nine to ten at night. He then stated, however, that he could not say he spent the entire night at home. Defendant denied shooting Bradley Washington, who he admitted having known since 1977.

On cross-examination, defendant admitted telling the police a different story, after he was arrested, of his whereabouts on the night of December 15. Specifically, he told them that if he left his apartment that night, he and his girlfriend, Irene Ealey, walked to 57th and State at about 7 p.m. and called for a cab from there which arrived about an hour later. They took the cab to 4544 South Ellis, where they stopped to see someone named Brownie. After finding that Brownie was not home, they took the cab to the home of Irene Ealey's mother at 7839 South Muskegon, where Irene got out of the cab. Defendant took the cab back to Brownie's, who was still not home. He then took the cab to his mother's home at 4810 South Calumet, arriving there at about 11 or 12 p.m., and remained there the rest of the evening.

Irene Ealey testified for the State in rebuttal. She admitted being defendant's girlfriend in December 1985. However, she denied having gone on the evening of December 15 to any of the locations enumerated by defendant. She also denied knowing a person named Brownie.

*Miles,* 176 Ill.App.3d at 761–63, 126 Ill.Dec. at 267–69, 531 N.E.2d at 892–93.

## II. Confrontation Clause

Miles has shown neither the Illinois Court of Appeals' findings nor the proceedings of any of the Illinois courts to be questionable or erroneous. Therefore, we presume the Illinois Court of Appeals' findings to be correct. 28 U.S.C. § 2254(d); *Milone v. Camp,* 22 F.3d 693, 699 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 720, 130 L.Ed.2d 626 (1995). We review *de novo* whether the petitioner's constitutional rights were violated, *id.* at 698, but we will grant relief only if any such errors "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (quoting and adopting the standard of *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *see also Tague v. Richards,* 3 F.3d 1133, 1140 (7th Cir.1993) (applying the *Brecht* standard to the Confrontation Clause).

Miles' case centers around Officer Ptak's discussion of the anonymous tip he received:

PROSECUTOR: And did you happen to be at Area 3 headquarters at approximately 10:00 o'clock in the morning?

PTAK: Yes, I was.

\* \* \* \* \* \*

PROSECUTOR: Did you receive a telephone call at this time?

PTAK: Yes, I did.

PROSECUTOR: And what was the voice on the phone, a male or female voice?

PTAK: It was a male voice.

PROSECUTOR: Did the person identify themselves [sic]?

PTAK: No, he did not.

PROSECUTOR: And what did this person say to you?

PTAK: He told me that the man that was shot at 69th and Union was shot by a man by the name of Isaac Miles, whose name was—whose nickname was called, Ike.

MR. BYRD (Miles' Attorney): Objection if the Court please.

THE COURT: Sustained.

MR. BYRD: Repetitious.

THE COURT: Sustained.

Stricken.

Proceed.

Although the court sustained the defendant's objection and ordered the testimony stricken, the prosecution referred to the anonymous tip in its closing argument:

So Ray Washington couldn't name Isaac Miles for the police to get him. But the police got an anonymous phone call, not from Ray Washington.

And immediately after getting that anonymous phone call they went out looking for Isaac Miles. Located his address. They went to that address.

That's when they picked him up. Ray Washington did not in effect tell the police, "It was Isaac Miles who did it."

Who do you think made the anonymous phone call, what made the police go out and pick up Isaac Miles?

Perhaps a second person? Somebody else who didn't want to get involved. Somebody would [sic] didn't have the courage Ray Washington had to get up and tell you that's what happened. But nevertheless did inform the authorities that's what happened.

Miles alleges that officer Ptak's testimony about his conversation with the tipster amounted to hearsay and that its insertion into the trial, combined with the prosecutor's closing reminder of its content, amounted to a violation of his right to confront the witnesses against him.

 Illinois defines hearsay evidence as "in court testimony ... of a statement made out of court which is offered as an assertion of the truth of the matter contained in the out of court statement." *Van Steemburg v. General Aviation, Inc.*, 243 Ill.App.3d 299, 330, 183 Ill.Dec. 496, 527, 611 N.E.2d 1144, 1165 (Ill.App.Ct.1993). The Confrontation Clause requires that, where the declarant is unavailable to testify, hearsay must bear sufficient indicia of reliability to be admitted into evidence. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Hearsay can satisfy this reliability requirement either through a firmly rooted hearsay exception or through a particularized guarantee of trustworthiness. *Id.* So, not all hearsay violates a defendant's Confrontation Clause rights. However, hearsay that may be admissible under a state's rules of evidence may still violate the Confrontation Clause: the two are not congruent, though they stem from the same regard for the defendant's right to examine the credibility of the witnesses. *Dutton v. Evans*, 400 U.S. 74, 81, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970).

 Ptak's testimony about the content of the anonymous tip was inadmissible hearsay. While a theory may exist to support disclosing the existence of a tip other than for its truth,[1] here it appears that demonstrating the truth of the tipster's assertion was the point of Ptak's testimony. The trial court judge properly sustained Miles' objection to the testimony and ordered it stricken, and the state has never tried to advance a legal theory in support of its admissibility.

Under *Roberts* the testimony undoubtedly poses a Confrontation Clause problem. The declarant was not even known, much less available; anonymous tips do not compose a firmly rooted exception to the hearsay rule; and the prosecutor has offered nothing about the statement to show its trustworthiness. The jury had no way of judging, among other concerns, whether the declarant had seen the shooting or whether the declarant held a personal vendetta against Miles. A bald assertion of Miles' guilt by an anonymous party may have served as a proper basis to investigate Miles, but it cannot serve as a basis upon which to convict him. *See, e.g., Harris v. Wainright*, 760 F.2d 1148, 1151–53 (11th Cir.1985) (concluding that a police officer's implied reference to an anonymous informant's help in identifying the defendant violated the Confrontation Clause); *Hutchins v. Wainright*, 715 F.2d 512, 517 (11th Cir.1983), *cert. denied*, 465 U.S. 1071, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984) (concluding that a police officer's testimony as to what an anonymous source told him about a crime, combined with the prosecutor's reference to it in closing argument, violated the defendant's confrontation rights); *Stewart v. Cowan*, 528 F.2d 79, 81 (6th Cir.1976) (holding that the admission of the police officer's testimony that he had received several telephone calls from anonymous sources stating that the defendant had shot the victim violated the Confrontation Clause); *Favre v. Henderson*, 464 F.2d 359, 364 (5th Cir.1972), *cert. denied*, 409 U.S. 942, 93 S.Ct. 235, 34 L.Ed.2d 193 (1972) (holding as violative of defendant's confrontation rights a police officer's implication that an anonymous informant's tip, which had been

---

1. For example, in the federal context we have recognized that "[a]n out of court statement is not hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken." *United States v. Lazcano*, 881 F.2d 402, 407 (7th Cir.1989) (quoting *United States v. Love*, 767 F.2d 1052, 1063 (4th Cir. 1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 890 (1986)). In this case, had the officer limited his testimony to the fact that he had received a call that caused him to investigate Miles, but not revealed the content of the conversation, Miles' confrontation rights might not be an issue.

offered for the truth of the matters asserted, had led the officer to arrest the defendant).

■ Acknowledging that the hearsay violated Miles' confrontation right is only half the issue, however. As noted above, we will grant Miles' petition for habeas corpus relief only if we find that the offending testimony had a substantial and injurious effect or influence on the jury's verdict. *Tague,* 3 F.3d at 1140. We do not find any substantial and injurious effect or influence.

■ Miles attempts to discredit Washington's testimony in order to make it seem more likely that the jury depended upon the police officer's testimony about the anonymous tip when it found Miles guilty. Where the only evidence introduced against a defendant besides a Confrontation Clause-offending anonymous tip is a shaky eyewitness identification of the defendant, courts have granted habeas corpus relief. *See, e.g., Gaines v. Thieret,* 846 F.2d 402, 406–07 (7th Cir.1988) (holding, for purposes of the death penalty, that the introduction of inadmissible hearsay was not harmless where the hearsay consisted of one assailant's implication that other assailant was the triggerman and the only other eyewitness had been smoking marijuana the day of the murder and was otherwise "not bright"); *Harris,* 760 F.2d at 1151–53 (concluding that error was not harmless where an anonymous tip bolstered the visual identification of the defendant made by the two victims, one of whose testimony was undercut by his previous identification of another person as the assailant); *Hutchins,* 715 F.2d at 517 (finding error was not harmless because the only in-court positive identification of the petitioner was subjected to rigorous cross-examination and was equivocal); *Favre,* 464 F.2d at 364 (finding harmful error where most witnesses saw the assailant with a handkerchief covering his face and the defense attorney vigorously cross-examined the only witness who saw the defendant's face unobstructed).

Miles impresses upon us that eyewitnesses to crimes often mistakenly identify the perpetrators. He also insists that the government's key witness in this case, Raymond Washington, probably misidentified Miles because he had never met Miles before, it was night, and Washington never really got a good look at the assailant's face. He also suggests that Washington's failure to relate immediately what he saw to the police undermines his certainty and credibility. While we recognize that eyewitness identifications might be flawed in some instances, in this case we do not detect any inconsistencies in Washington's story or find persuasive any arguments that he misidentified the assailant.

We conclude that Raymond Washington's identification of Miles as the assailant of Bradley Washington, combined with Miles' own inability to account truthfully for his whereabouts that evening, is sufficient to defeat Miles' habeas corpus petition. Although the shooting occurred at night, Washington stood only ten feet away from both the victim and the assailant and got a good look at the murderer under a bright street light. Two police officers confirmed that the area where the crime occurred was well lit, and Washington accurately described several details of the shooting, such as the victim's holding a cigarette in one hand and the telephone in the other. His observation of these details suggests that Washington perceived the scene attentively and was not overcome by the stress of the moment. When asked to identify the defendant in a lineup, Washington did not wait until its completion before identifying Miles. For his part, Miles told police different versions of his whereabouts the night Bradley Washington was shot. And Miles' girlfriend, Irene Ealey, eviscerated Miles' alibi when she denied going where Miles said they had gone that night.

Finally, when officer Ptak referred to the anonymous tipster during his testimony, the trial judge sustained Miles's objection and ordered the testimony stricken. Striking the testimony indicated to the jury that the tip was not a proper foundation upon which to find the defendant guilty. The prosecutor's reference in closing argument to the anonymous tip, while it reminded the jurors of its existence, ambiguously rambled about its role in the investigation and pointlessly questioned who the tipster might have been. While this reference was improper, it does not constitute the sort of focusing argument

that would likely cause a jury to rely on the tip as a basis for convicting the defendant.

In light of the evidence against Miles, we find that Miles has not met his burden of demonstrating that officer Ptak's testimony about the anonymous tip had a substantial and injurious effect or influence in determining the jury's verdict.

### III. Ineffective Assistance of Counsel

 Miles also claims that he received ineffective assistance of counsel at both the trial and appellate stages of his case. He claims his trial counsel was inadequate for not making objections to the prosecutor's reference to the anonymous tip during closing argument. This failure to object altered the standard through which the Illinois Court of Appeals viewed the prosecutor's remarks. Had his attorney preserved the issue through a proper objection and included it in a motion for a new trial, Miles argues, the Illinois Court of Appeals would have reviewed the trial for prejudicial error; instead, they reviewed the record for plain error, a tougher standard for Miles to meet. Miles also argues that his counsel on direct appeal was incompetent for not raising the incompetency of his trial counsel as a reason for awarding him a new trial.

The backbone of both of these claims is Miles' assumption that the anonymous tip was reversible error. Because we have found Miles' Confrontation Clause claim to present harmless error, Miles will not be able to demonstrate any prejudice even if he shows that his counsel at either level fell below an objective reasonable standard, as demanded by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A better-preserved claim may have entitled Miles to a more favorable standard of review on direct appeal. But, as the Illinois Court of Appeals relied heavily on the strong eyewitness testimony against Miles, we cannot say that there is a probability that it would have ruled in favor of Miles had his lawyer better preserved his Confrontation Clause claim. Because no prejudice arises from any error of Miles' trial counsel, Miles' claim that his appellate counsel was ineffective for failing to raise the errors of his trial counsel is precluded. Thus, Miles' ineffective assistance of counsel claims fail.

AFFIRMED.